**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **EFRAIN MORALES,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 00 C 2656** |
| | ) | |
| **TERRY McCANN,** | ) | |
| | ) | |
| **Respondent.** | ) | |

**MEMORANDUM OPINION AND ORDER**

MATTHEW F. KENNELLY, District Judge:

In May 1996, a Cook County jury convicted Efrain Morales of murder, two counts of attempted murder, and two counts of aggravated battery with a firearm, in connection with a shooting that took place in October 1994. The trial judge later sentenced Morales to sixty years in prison for murder and a consecutive term of thirty years for attempted murder.

Morales has petitioned this Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. In his second amended petition, filed by appointed counsel, Morales contends that his trial counsel rendered ineffective assistance; he was convicted on the basis of perjured testimony; and the imposition of consecutive sentences violated due process.

The Court held an evidentiary hearing on the ineffective assistance claim, having ruled that Morales alleged facts that, if shown, would entitle him to relief; the fact-finding process in the state court in connection with his post-conviction petitions denied him a

full and fair hearing to explore the basis for the claim; and this was not attributable to any fault or lack of diligence by Morales. *See generally Richardson v. Briley*, 401 F.3d 794, 800 (7th Cir. 2005); *United States ex rel. Hampton v. Leibach*, 347 F.3d 219, 234-35 (7th Cir. 2003).

For the reasons stated below, the Court denies Morales' petition.

## Background

On the night of October 24, 1994, Billy Bradford, Jose Nevarro, and Charles Crawford were repairing Bradford's car outside his home on Willard Court, on the near northwest side of Chicago. Two men wearing jackets with hoods came from an alley across the street from Bradford's home and started shooting. Bradford was killed, and Nevarro and Crawford were wounded. Four people were charged in connection with the shooting: Walter Caldera, Mario Gonzalez, Michelle Jacques, and Morales.

**1. State court trial**

Morales retained attorney Robert Callahan to represent him. Judge John Morrissey presided over the case, which was tried on May 14-17, 1996. On the day the case was to go to trial, Gonzalez pled guilty and, in exchange, received a sentence of forty-four years. In pleading guilty, Gonzalez admitted under oath to a statement of facts that identified him and Morales as the two shooters. Caldera and Jacques opted for a bench trial; Morales was tried before a jury.

Bradford's widow Dorothy Bradford testified that she heard shots from inside her home around 10:30 to 10:40 p.m. on October 24, 1994. She went outside and found her husband lying dead on the ground. She testified that down the block, she saw a car

painted with gray primer with people inside who appeared to be looking at the shooting scene. She had seen the car in the neighborhood before, driven by people she knew as Mario, "Shotgun," and Palmer. She identified Morales as Shotgun. She also testified that she had seen Gonzalez and Jacques in the same car a few days earlier.

Charles Crawford testified that he had moved to Oklahoma from Chicago a number of years before the shooting. He had been a member of a street gang called the Satan Disciples. On the day of the shooting, he was in Chicago visiting his son, who lived across the street from Bradford. That night, he was helping Bradford and Nevarro fix Bradford's car, which was parked in front of his house under a street light.

At some point, Bradford and Nevarro went inside to get some parts. While they were inside, Crawford saw a white Chevrolet and another Chevrolet painted with gray primer drive north on Willard Court, with three or four people inside each car. Crawford testified that he recognized Gonzalez in the gray car. Gonzalez displayed a series of gang signs indicating that he was "folks" – a group of gangs that included the Satan Disciples and the Milwaukee Kings – but would also kill other "folks." Crawford was afraid but felt more comfortable when Bradford and Nevarro returned.

After they started working on the car again, Crawford heard Nevarro yell, "look out," and then saw two men he identified as Gonzalez and Morales coming out of the alley across the street. They were wearing black hooded jackets with the hoods up, but he could see their faces. Crawford said he had seen Gonzalez earlier that evening and had seen Morales several times before, though he did not know Morales' name at the time. The two men started shooting, Gonzalez with a nine millimeter handgun and Morales with a chrome revolver. Crawford then saw the white Chevrolet pull up, and

someone yelled "hurry up."  He said that the two shooters then ran west down an alley adjacent to Bradford's home.

Crawford testified that when the police arrived, he gave them a false name – Charles Vega – because he was scared.  He was taken to a hospital for treatment for a gunshot wound to his leg.  Police officers came to the hospital and showed him an array of photographs, from which he identified Gonzalez as one of the shooters.  Crawford said he would talk to the police further after he got out of the hospital, but instead he returned to Oklahoma.  He testified that he did not return to Chicago until the morning of trial.  That morning, police officers showed him another array of photographs, and he identified Morales as the other shooter.

Morales' counsel cross-examined Crawford to attempt to cast doubt on his ability to see the shooters given where he was situated, the brief opportunity he had to see their faces, the fact that they were shooting at him, and the fact that he was trying to avoid being shot.  Crawford admitted that at the scene of the shooting, he described the shooters only as Hispanic men wearing black hooded jackets.  He conceded that the first time he had identified Morales was the morning of the trial.  He also admitted that he had not given his real name to law enforcement until a prosecutor contacted him several months before the trial.

Jose Nevarro testified that he had been a member of the Satan Disciples street gang but had quit the gang in 1991 or 1992.  He admitted that he had pled guilty to narcotics crimes in 1989, 1993, and 1994.  He said the area where the shooting occurred was controlled by the Satan Disciples but bordered on an area controlled by the Milwaukee Kings.  He said that both gangs were "folks," meaning they were aligned

4

gangs, but that there were conflicts between them at the time of the shooting. He said that Morales and Caldera were Milwaukee Kings and that Jacques was a Milwaukee Queen.

Nevarro testified that he, Bradford, and Crawford were fixing Bradford's car. He and Bradford went inside to get some parts and then returned and continued working on the car. Nevarro saw a noise, looked in the direction of the noise, and saw two men approaching. He identified the two men as Gonzalez and Morales. Gonzalez was carrying a black automatic handgun, and Morales was carrying a chrome revolver. Nevarro also saw a third man who stayed in the alley across the street. Nevarro yelled, "watch out," and the two men started shooting. After the shooting stopped, Nevarro saw a "gray jacked up kind of car" driving down Huron Street. He testified that he had seen Milwaukee Kings drive the car before, usually Gonzalez, Morales, or a man named Adrian.

Nevarro testified that he spoke to the police briefly at the scene and told them he had seen a gray car in the neighborhood. He was taken to a hospital for treatment for a gunshot wound to his leg. While at the hospital, two detectives came and asked him to view a lineup. He did so and identified Gonzalez as one of the shooters. He also told the detectives that "Shotgun," whom he identified as Morales, was the other shooter. He identified Morales from an array of photographs in the early morning hours of October 25.

On cross-examination, Nevarro testified that immediately after the shooting, he did not want the police to find the shooters (on redirect, he said he had wanted to "take care of them" himself), so he just told them he had seen the car of a Milwaukee King

named Adrian in the area. He said that it was only after he identified Gonzalez in the lineup that he told police the shooters were three Milwaukee Kings in black hooded jackets. Nevarro admitted that when the shooting started, he was partly under the car fixing it, lying on his stomach.

Chicago police officer Joe Moran testified regarding, among other things, photographs of the crime scene and shell casings and bullet fragments found there. He testified that it appeared two weapons had been used.

Chicago police officer Carlos Ramirez testified that around the time of the shooting, there was a dispute between the Milwaukee Kings and Satan Disciples involving a member of the latter gang who had switched his affiliation to the Milwaukee Kings. Ramirez testified that he had seen a gray-primered Chevrolet in the area of the shooting three times about a week earlier, driven (respectively) by Adrian Renteria, Julio Mercado, and Gonzalez – the latter with Caldera and Jacques in the car. After the shooting, an alert went out that a gray car was potentially involved in the shooting. He and his partner located the car and pulled it over. Gonzalez was driving, with Jacques and Caldera in the car. Ramirez later found a nine millimeter handgun when conducting a search of the home where Gonzalez and Jacques lived. James Treacy, a firearms technician working in the Chicago Police Department crime lab, testified that the gun found at the Gonzalez-Jacques home had fired some of the cartridges recovered at the shooting scene but that a second gun had fired the others.

Chicago police detective George Tracy testified that by the time he arrived at the scene of the shooting, all the victims had been taken to hospitals. He stated that there was "excellent" lighting at the shooting scene. Tracy said that after he received

6

information that another police officer had stopped a gray primered Oldsmobile in the area, he returned to Area Four police headquarters and met with the occupants of the car, Caldera, Gonzalez, and Jacques. He then spoke to Nevarro at the hospital and asked him to try to identify one of the shooters in a lineup. He arranged for another officer to bring Nevarro to Area Four headquarters. He then visited Crawford at a different hospital. He showed Crawford a photographic array, and Crawford identified Gonzalez as one of the shooters. He made arrangements for Crawford to come to Area Four, but Crawford never came.

Tracy testified that he then returned to Area Four and took statements from Caldera, Gonzalez, and Jacques. He then traveled to the homes of Morales and someone named Palmer but could not find them. He again returned to Area Four, and at 4:15 a.m. he conducted a lineup, from which Nevarro identified Gonzalez as one of the shooters. He also showed Nevarro an array of photographs, from which Nevarro identified Morales as the other shooter. Tracy testified that on the first day of the trial, he and his partner showed Crawford a photo array from which Crawford identified Morales as one of the shooters.

On cross-examination, Tracy confirmed that Nevarro did not identify Morales until he came to Area Four headquarters and that Crawford did not identify Morales until the morning of trial, about one and one-half years after the shooting. Tracy testified that only he and his partner were present when the photo array was shown to Crawford. On redirect, Tracy said he had been careful to ensure that Crawford did not see Nevarro's signature on the back of Morales' photo.

On May 16, 1996, Katrina Scimone ("Katrina") testified that she formerly lived at

7

the corner of Huron and Bishop in Chicago. She was familiar with the Milwaukee Kings and, several years earlier, had been a Milwaukee Queen for one week. Her father forced her to drop out of the gang, but she remained friendly with Milwaukee Kings and Queens.

In October 1994, Katrina testified, she was friendly with Morales, though they were not dating. She was living in the suburbs at the time. She testified that she was not with Morales on October 24. She stated that Morales called her on October 28, and that she called him back from her sister's house that afternoon. Morales asked her to meet, but she told him she did not have a ride. Morales then told her that there had been a shooting and that a man had been shot. He said that he was there and was involved with the shooting. He asked Katrina to tell the police that she was his fiancee and that she was with him on October 24. She testified that Morales told her to say that she and her father had picked him up at 6:30 or 7:00 p.m. and dropped him back off at 1:00 a.m. He also had her describe the furniture in her house and how it was arranged.

Around 9:00 or 10:00 that night, Katrina testified, her father took her to Morales' sister's house on Haddon Street in Chicago. She said that Morales told her that he and the gang were involved in the shooting. He again asked her to tell police that she was his fiancee and had been with him on the night of the shooting. Katrina testified that she agreed to lie for Morales.

Katrina testified that on November 15, a police detective and a prosecutor visited her. She told them that Morales asked her to lie for him. On November 19, she said, Morales called her and said he was angry that she had not given the agreed-upon alibi. He then asked her to connect a three-way call with a man named Ricky, whom she

described as the head of the Milwaukee Kings. She overheard Morales tell Ricky's grandmother to tell Ricky to talk to the Satan Disciples and get them to tell Nevarro ("Little Man") not to sign a statement against Morales. Katrina said that Morales called her several more times to express his anger that she had refused to lie for him.

On cross-examination, Katrina denied that she had been threatened by the prosecution into testifying. Callahan asked how she had gotten to court, and she said that detectives had picked her up. Katrina reiterated on cross-examination that Morales had told her he was present at the shooting and that he was one of the shooters. Callahan attempted to impeach Katrina's implication that Morales had never been to her house by reading her grand jury testimony, in which she had stated that Morales had been to her house a week before her birthday on October 13. Katrina replied that Morales had been to her house in the city, not her house in the suburbs.

On redirect, Katrina stated that she was not staying at home during the trial because she had gotten threatening phone calls. She testified that as a result, police detectives had picked her up to bring her to court. Judge Morrissey *sua sponte* struck her testimony about threats and gave the jury a curative instruction.

Officer Johnny Andreani was called by the defense to testify. He stated that when he interviewed Nevarro at the scene of the shooting, Nevarro said only that the shooters were three Hispanic males in black hooded jackets and that a car that belonged to a Milwaukee King named Adrian was in the area at the time of the shooting. Detective Karen Hansen, also called by the defense, testified that she interviewed Nevarro at Area Four headquarters. He stated only that he saw three Hispanic males come out of the alley and that two of them had guns.

Defense attorney Callahan presented no other witnesses. Outside the jury's presence, Judge Morrissey advised Morales of his right to testify, but Morales chose not to invoke that right.

In his closing argument, Callahan argued that the prosecution had not proven that Morales was the second shooter. He attacked the testimony of Crawford, Nevarro, and Katrina Scimone. He argued that Morales had not really confessed his involvement to Katrina. He also argued that Morales had visited Katrina's home in the suburbs before, and thus she would not have had to describe it to him if he wanted to concoct a false alibi. Callahan argued that Crawford's testimony was unreliable because he had given the police a phony name and that his claimed justification – fear – was inconsistent with his other actions, including identifying Gonzalez from the photo array. Callahan also questioned Crawford's ability to identify Morales for the first time on the day of trial given that he had not identified him at the time of the shooting. Callahan also attacked Nevarro's testimony on the ground that he had not identified Morales when interviewed at the shooting scene. He said that Nevarro was blaming Morales to try to get back at the Milwaukee Kings.

In both its closing argument and rebuttal, the prosecution emphasized the importance of Katrina Scimone's testimony. In closing argument, the prosecutor argued that the evidence showed not only that Morales had asked Katrina to make up a false alibi, but also that he had, twice, admitted to her that he was involved in the shooting. *See* May 17, 1996 Tr. D38 (Morales told Katrina "we were out there shooting and a man got shot") & D39 ("We were out there shooting and then a man got shot."). In rebuttal, the prosecutor spent more time discussing Katrina's testimony than that of

10

any other witness.  She referred to Katrina's testimony as "compelling."  *Id*. D86.  The
prosecutor said, "this is what he told her:  Katrina you have to help me.  We were all
shooting and a man got shot.  Gee, how does he know that.  How does he know a man
got shot?  How does he know the perfect time as he is sitting [sic] at this alibi?  We
were all shooting."  *Id.*  The prosecutor repeatedly emphasized that Morales had
squarely admitted to Katrina his involvement in the shooting:  "She kept answering he
said he was shooting, too.  He said we.  He said he was shooting, too.  She said that.
He said we were all shooting. . . .  We were all shooting means he was shooting as
well."  *Id.* D86-87.  The prosecutor stated that "I know that he did this, ladies and
gentlemen.  He admitted to Katrina that he shot Mr. Bradford.  He said a man got shot,
we were all shooting."  *Id.* D88.

The judge instructed the jury and sent them to deliberate.  Within a few minutes,
Callahan pointed out that the judge had failed to read the standard instructions
regarding the presumption of innocence and the prosecution's burden to prove guilt
beyond a reasonable doubt.  The judge recalled the jury and read the instruction.  This
was about four minutes after the jury had retired to deliberate.  The judge conducted a
short inquiry of the deputy sheriff assigned to the jury.  The deputy stated that he was
collecting the jurors' belongings when they were called back into court and that they
had not begun to look at the evidence or discuss the case.

The jury convicted Morales of first degree murder for the death of Bradford and
attempted first degree murder and aggravated battery with a firearm for the shooting of

Crawford and Nevarro.[1]  At sentencing, the judge stated that "the aggravation here is unbelievable."  He imposed a sixty year prison term for murder and a thirty year term for attempted murder.  He concluded that Morales had inflicted severe bodily injury and, as a result, made the terms consecutive.

## 2.    Direct appeal

Morales retained attorney Irwin Frazin to represent him on appeal.  Frazin argued that the judge had erred in allowing the jury to retire to deliberate without giving an instruction on the burden of proof and the presumption of innocence.  He also argued that attorney Callahan had rendered ineffective assistance of counsel because, among other things, he failed to object to the admission of Katrina's prior consistent statements to law enforcement about Morales' attempt to get her to fabricate an alibi.

The Illinois Appellate Court affirmed Morales' conviction.  *People v. Morales*, No. 1-96-2582, slip op. (Ill. App. Nov. 5, 1997) ("*Morales I*").  On the claim of ineffective assistance, the court did not directly address whether Callahan had performed deficiently but rather held that any error had not prejudiced Morales.  The court stated that the evidence was "not closely balanced" and that the testimony that had been "bolstered" by the admission of the prior consistent statement "was not critical to a finding of defendant's guilt.  Two eyewitnesses identified defendant, and the physical evidence supported the eyewitness testimony."  *Id.* at 11.  The court stated that the bolstered testimony "was directed to the defendant's consciousness of guilt, not an eyewitness account of the crime.  The failure to object did not critically impact on the

---

[1]  The trial judge separately convicted Caldera of conspiracy to commit murder and acquitted Jacques of murder.

determination of defendant's guilt." *Id.*

The appellate court denied Morales' petition for rehearing on January 22, 1998. Morales did not file a petition for leave to appeal to the Illinois Supreme Court.

### 3. First post-conviction petition

Attorney Frazin filed a post-conviction petition on Morales' behalf on March 27, 1998 and filed an amended petition later that year. In the initial petition, Morales argued that Callahan had rendered ineffective assistance by failing to investigate the case properly. He argued that Callahan should have obtained gunshot residue tests performed on the co-defendants, medical records for the victims, and telephone records for Katrina and Morales. He also argued that Callahan should have tried to contact additional witnesses, including Katrina's father Thomas Scimone ("Thomas") and her younger sisters, who Morales said were with him at the time of the shooting; Laurie Benbeneck, a friend of Katrina's who Morales said accompanied him to her home on October 28; and John Montalvo and Julio Mercado, who gave the police information about the shooting and who may have been involved. Morales also argued that Callahan should have taken more systematic notes throughout his representation of Morales.

In the amended petition, Morales added further contentions to support his claim that he had been denied effective assistance of counsel. He argued that Callahan should have had a "prover" with him when he interviewed Katrina and that because he did not, he was unable to impeach Katrina with a statement she had made to him (Callahan) that she did not actually know whether she was with Morales on the night of the shooting or not. Morales also argued that Callahan should have interviewed

Katrina's father Thomas and called him testify as an alibi witness.

In support of these arguments, Morales submitted two affidavits from Katrina dated May 19 and May 29, 1998 and an affidavit from Thomas dated May 31, 1998. In her affidavits, Katrina said that she did not remember whether she was with Morales on the night of the shooting. She said she had told Callahan this when he interviewed her before the trial. She said she had told the police she was not with Morales because she was scared and did not know what to say. In his affidavit, Thomas said he remembered being with Morales on the night of the shooting. He and Katrina picked Morales up around 6:00 p.m. that evening, took him to their house, and drove him back to Chicago around midnight. He said that while at their house, Morales sold him an "eight-ball" of cocaine, helped Thomas cook it into crack cocaine, and then smoked marijuana while Thomas smoked the crack. Thomas also stated that on the first day of Morales' trial, he spoke with Callahan and said he had been with Morales on the night of the shooting. Callahan said he would get back to Thomas if he was needed to testify but then never called Thomas back.

The trial judge summarily denied Morales' petition in June 1998. He stated that "the performance of Mr. Callahan was not remiss to the point contemplated by Strictland [sic] versus Washington. As far as I am concerned, there's no demonstration in the defendant / petitioner's petition that the result somehow would be different." The judge stated that "[t]he young lady did testify for Mr. Morales [sic], but certainly the case didn't rise or fall on her testimony. The evidence was sufficient to prove guilty [sic] beyond a reasonable doubt." June 18, 1998 Tr. 9. The judge made no comments directly addressing trial counsel's claimed failure to investigate and call Thomas

14

Scimone.

The Illinois Appellate Court affirmed the denial of Morales' post-conviction petition.  *People v. Morales*, No. 1-98-2749, slip op. (Ill. App. Oct. 20, 1999) ("*Morales II*").  The court ruled that the trial judge had not erred in denying the petition without holding an evidentiary hearing.

With respect to the claim of ineffective assistance, the court did not address whether Callahan had acted deficiently in failing to have a "prover" present when he interviewed Katrina.  Rather, the court went directly to the issue of prejudice.  It repeated the determination on direct appeal that Katrina was merely a corroborating witness and that her testimony "did not so prejudice defendant that he was deprived of a fair trial."  *Id.* at 9.  The court concluded that Morales had not shown a reasonable probability that the outcome of the trial would have been different had Callahan impeached Katrina.  *Id.*

The court also ruled that Callahan did not act unreasonably in failing to call Thomas because counsel had an "apparent strategic reason":  Thomas's statement that he and Morales were conducting a drug transaction at the time of the shooting.  *Id.* at 10.  The court did not address the issue of prejudice with regard to Callahan's failure to call Thomas as a witness.

The court denied Morales' petition for rehearing, and the Illinois Supreme Court denied his *pro se* petition for leave to appeal.  *People v. Morales*, No. 88702 (Ill. S. Ct. Jan. 10, 1999).

**4.      Federal habeas corpus petition - round one**

Morales filed a *pro se* federal habeas corpus petition on May 1, 2000.  In response, the state argued that Morales had procedurally defaulted certain aspects of his claim of ineffective assistance.  Morales asked for a stay so that he could file a second post-conviction petition.  The Court denied the motion, concluding that it would be more appropriate to develop a more complete record and consider the propriety of a stay while addressing the procedural default issue.  *Morales v. Cowan*, No. 00 C 2656, 2000 WL 1898584, at *2 (N.D. Ill. Dec. 20, 2000).

The Court then appointed counsel.  Around the same time, Morales filed a second post-conviction petition, which the Court will discuss below.  Appointed counsel filed an amended habeas corpus petition.  That petition asserted some of the same issues that Morales had raised in the second post-conviction petition.  The Court concluded that the proper procedural course was to dismiss the amended petition without prejudice due to failure to exhaust certain of the claims, giving Morales permission to reinstate the petition once he had exhausted state court remedies.  *Morales v. Cowan*, No. 00 C 2656, Order of Jan. 17, 2002.

**5.      Second post-conviction petition**

As the Court has noted, Morales, acting *pro se*, filed a second post-conviction petition in early 2001.  He asserted eleven grounds for overturning his conviction:  (1) the trial judge improperly dismissed his first petition; (2) his post-conviction counsel rendered ineffective assistance; (3) the prosecution withheld evidence favorable to him; (4) the judge improperly imposed consecutive sentences in violation of *Apprendi v. New*

*Jersey*; (5) the judge imposed a disparately harsh sentence; (6) the prosecution presented perjured testimony at trial; (7) newly discovered evidence proved his innocence; (8) the Crawford photo array was impermissibly suggestive; (9) trial counsel rendered ineffective assistance; (10) appellate counsel rendered ineffective assistance on direct appeal; and (11) the evidence was insufficient to convict.

Morales submitted several supporting affidavits, most of which concerned his claims that he was innocent, perjured testimony was used to convict him, and his trial counsel was ineffective. Three Illinois prison inmates, Melvin Boyd, Albert Guerra, and Oswaldo Arroyo, submitted affidavits stating that Nevarro told them he had falsely implicated Morales in the shooting. Mario Gonzalez submitted an affidavit stating that Robert Moncada was the other shooter, not Morales. Desire Aponte submitted an affidavit stating that Moncada told her he was the other shooter. Juan Carasquillo, another prison inmate and a friend of Morales, submitted an affidavit stating that he had not spoken with Katrina or anyone else about Morales' case in October 1994 (the Court assumes this was the "Ricky" referenced in Katrina's testimony at the criminal trial). Morales also resubmitted the affidavits of Katrina and Thomas Scimone that had accompanied his first post-conviction petition.

Judge Evelyn Clay dismissed the petition, concluding it was frivolous and patently without merit. *People v. Morales*, No. 94 CR 29937, slip op. (Cir. Ct. of Cook Cty. May 30, 2001). She concluded that the petition was an improper second post-conviction petition. *Id.* at 3. She also concluded that several of Morales' claims (identified above as claims 3, 5, 6, 8, 9, 10, and 11) could have been raised on direct appeal or his first post-conviction petition and thus were barred by principles of claim

17

preclusion and waiver.  *Id.*  The judge also found that the petition was untimely.  *Id.* at

3-4.  The judge went on to address claims 2, 4, and 7 on the merits and found them

deficient.  *Id.* at 4-6.

The Court notes that the state court judge made a factual error in discussing the

affidavits of Katrina and Thomas Scimone.  The judge wrote that

> petitioner asserts that the affidavits of Katrina Scimone and Thomas
> Scimone substantiate his alibi defense and show that he was with them at
> the time the instant crime occurred.  Petitioner, however, drastically
> misrepresents the content of their affidavits.  In fact, both Katrina and
> Thomas, in affidavits signed on May 19, 1998 and May 29, 1998,
> respectively indicate that they do not know if they were with petitioner at
> the date and time in question.  Interestingly enough, two days after
> signing his affidavit, Thomas changes his mind and indicates that
> petitioner was with him on the date in question.  This information is
> contradictory and certainly insufficient to exonerate petitioner or to change
> the result of his trial.

*Id.* at 6.  The judge erroneously attributed the May 29 affidavit to Thomas Scimone.  In

fact, Katrina (not Thomas) submitted two affidavits, dated May 19 and May 29, and in

both of them, she said she did not know whether she was with Morales on the night of

the shooting.  Thomas submitted only one affidavit, dated May 31, in which he stated

that he was with Morales on the night of the shooting.  Thus the state court judge had

no basis to find that Thomas had suddenly changed his version of the events or that

Morales had misrepresented the content of the affidavits.

Morales filed a motion for reconsideration, which the state court judge denied.

He then filed an appeal, in which he was represented by an assistant public defender.

On appeal, Morales argued that the trial court erred in summarily dismissing the petition

without conducting an evidentiary hearing or appointing counsel to investigate whether

his counsel on direct appeal had rendered ineffective assistance.  Specifically, he

18

argued that appellate counsel was deficient in failing to raise on direct appeal the claims that the trial judge had found barred by waiver in the second post-conviction petition.  Morales also argued that the trial judge had erred by refusing to order a new trial in light of the fact that the new evidence showed that Moncada, not Morales, was the second shooter.

The Illinois Appellate Court affirmed the dismissal of the petition.  *People v. Morales*, 339 Ill. App. 3d 554, 791 N.E.2d 1122 (2003) ("*Morales III*").  It stated that Morales had "abandoned" his claims from the second petition other than the two arguments noted above.  *Id.* at 560, 791 N.E.2d at 1127-28.  The court acknowledged that Morales could raise in a second post-conviction petition claims of ineffective assistance of appellate counsel and actual innocence based on new evidence, but it found the claims lacked merit.  *Id.* at 560, 791 N.E.2d at 1128.  The court said that untimeliness, claim preclusion, and waiver were insufficient to justify summary dismissal of the petition.  *Id.* at 560-61, 791 N.E.2d at 1128.  It stated, however, that the dismissal was "properly based on [the trial court's] substantive finding that the claims were frivolous or patently without merit . . . ."  *Id.* at 561, 791 N.E.2d at 1128-29.

The court went on to reject, on the merits, Morales' claim that his attorney on the direct appeal of his case was ineffective for failing to assert claims of disparate sentencing and ineffective assistance of appellate counsel based on trial counsel's failure to challenge the photo identification by Crawford and failure to interview the Scimones and Gonzalez.  On the latter point, the court stated that

> it was not unreasonable for appellate counsel to forgo pleading that trial
> counsel was ineffective for failure to interview the Scimones and Gonzales

[sic].  Trial counsel had no reason to believe in 1996 that Katrina would
equivocate in 1998 or Gonzales would change his statement in 1998.  As
to Thomas, defendant has not shown prejudice.  There is no ground for
believing that, had trial counsel interviewed Thomas and presented his
testimony about "cooking up" cocaine with defendant on the night of the
shootings, defendant would have been acquitted because of a credible
alibi.

*Id.* at 564, 791 N.E.2d at 1131.

Finally, the appellate court rejected Morales' claim of actual innocence based on

new evidence.  It concluded that the affidavits of Aponte, Boyd, Guerra, and Arroyo

contained inadmissible hearsay and that the affidavits of Gonzalez and Carasquillo

were unpersuasive.  It pointed out that the signatures of Gonzalez on his written

confession and his affidavit were dissimilar, and it also stated that the affiants "were not

credible and their statements are not sufficiently conclusive to support defendant's

claim of actual innocence."  *Id.* at 565, 791 N.E.2d at 1132.

### 6.    Federal habeas corpus petition - round two

After the Illinois Supreme Court denied Morales' petition for leave to appeal in

2003, Morales moved to reinstate his federal habeas corpus petition.  The Court

granted the motion and appointed counsel, who filed a second amended petition on

Morales' behalf.

The state argued that Morales' petition was time-barred because the time the

original petition had been pending counted against the one-year limitation period for

federal habeas corpus petitions.  The Court rejected this argument, finding that Morales

had relied on the Court's statement at the time that the dismissal would not harm his

ability to pursue the petition.  The Court also converted the earlier dismissal to a stay,

*nunc pro tunc*, eliminating the potential statute of limitations issue. *See* Order of Jan. 3, 2005.

On several dates from October 2005 through November 2006, the Court conducted an evidentiary hearing on Morales' claim of ineffective assistance of counsel. The hearing extended over that period partly due to significant difficulty in securing the presence of some of the witnesses. Further evidence was submitted to the Court in June 2007. The parties submitted post-hearing briefs in July 2007. The Court acknowledges that it has unduly delayed the matter by keeping it under advisement since that time and apologizes for the delay. In January 2010, the Court asked respondent's counsel to make inquiry regarding a particular point (discussed later) and make a further submission to the Court. Counsel did so on February 1, 2010.

**The evidentiary hearing**

The Court next reviews the evidence that was offered in this Court during the course of and after the evidentiary hearing that the Court conducted.

**1.    Mario Gonzalez**

At the hearing, on October 27, 2005, Mario Gonzalez testified that in his original statement to the police on October 25, 1994, the day after the shooting, he did not implicate Morales. He agreed, however, that when he pled guilty, he affirmed under oath the accuracy of a statement of facts that identified Morales as the second shooter. In response to questions by the Court, Gonzalez testified that he first heard the statement of facts when it was read into the record and that he affirmed it because his attorney told him to say yes to everything.

Gonzalez identified an affidavit that he signed in December 1998. He confirmed that he had signed the affidavit and that he stood by its contents. In the affidavit, Gonzalez reaffirmed his guilt but said that the second shooter was Roberto Moncada, not Morales, who Gonzalez said was not with him at the time of the shooting. On cross-examination, Gonzalez stated that he did not know when he executed the affidavit that Moncada had died.

## 2. John Rea

John Rea, a private investigator hired by Morales' appointed counsel, also testified on October 27, 2005. Rea stated that he located a death certificate for Roberto Moncada stating that he had been murdered on July 19, 1998. Rea confirmed that this was the same Moncada discussed in the affidavits submitted on Morales' behalf.

## 3. Oswaldo Arroyo

Oswaldo Arroyo also testified at the hearing on October 27, 2005. On August 8, 2000, he signed an affidavit in which he stated that on July 24, 1995 (in other words, after the shooting but before the trial), Jose Nevarro told him that he had never seen the faces of the shooters and that he had falsely implicated Morales. Arroyo testified at the hearing that the contents of his affidavit were true. He said he remembered the date of his conversation with Nevarro five years after the fact because the conversation happened on his (Arroyo's) birthday. He testified that at the time he signed the affidavit, he was incarcerated in the same prison as Morales. He was contacted by a detective hired by Morales' lawyer. Arroyo is serving a sentence for attempted murder

and also has convictions for unlawful use of a weapon and delivery of a controlled substance.

Respondent objected on hearsay grounds to the admission of Nevarro's alleged out-of-court statements to Arroyo. Nevarro's statement to Arroyo that he falsely implicated Morales is, in fact, hearsay. Though it arguably was a statement against Nevarro's penal interest (because he had told the police before the date of the statement that Morales was the second shooter), such statements are admissible only if the declarant is unavailable. *See* Fed. R. Evid. 804(b)(3). Morales made no attempt to show that Nevarro was unavailable to testify.

Nevarro's statement to Arroyo is therefore inadmissible on the merits of Morales' perjured testimony claim in the present case. But Morales has also offered Nevarro's statement as evidence to support his invocation of the "actual innocence" exception to habeas corpus procedural default rules, which respondent has cited in response to certain aspects of Morales' claims. The Supreme Court has made it clear that a court should consider all evidence, irrespective of its admissibility, in assessing the applicability of this exception. *See House v. Bell,* 547 U.S. 518, 537-38 (2006). The Court will therefore consider Nevarro's statement for that purpose.

### 4. Desire Aponte

Desire Aponte testified on February 9, 2006. She stated that she was the cousin of Roberto Moncada, who was murdered at the age of twenty-two. She testified that at her home a few days after the shooting, Moncada told her he was "the shooter" in the incident that later led to Morales' conviction. Aponte testified that a couple of years after the shooting, she started writing to Morales, whom she had known for about

23

nineteen years from the neighborhood. At some point (Aponte did not say when), Morales sent her a draft affidavit to the effect that Moncada had admitted his involvement in the shooting. She signed the affidavit on April 5, 1999. Aponte was aware that Moncada died in July 1998. She testified that the affidavit was true. Her testimony regarding Moncada's statement against penal interest is admissible because Moncada is unavailable to testify. *See* Fed. R. Evid. 804(b)(3).

## 5. Efrain Morales

Morales testified at the hearing in this case on February 9, 2006.

Morales stated that the Scimones had lived in Elmwood Park for about a year before the shooting and that he had been at their home for Katrina's birthday party. He testified that on the night of the shooting, he was with Katrina and Thomas Scimone at their home. Thomas called him around 5:30 or 6:00 p.m. to arrange a meeting to buy some cocaine from Morales. Morales stated that Thomas and Katrina picked him up about a half hour later from his sister's house on Haddon Street in Chicago. Thomas was driving a white, two-door, stick-shift car. After they arrived at the Scimones' home, Morales testified, he sold Thomas a quantity of cocaine for $100 and helped Thomas cook it into crack cocaine. Morales watched television with Katrina and smoked marijuana with Thomas, who was smoking the crack. The Scimones took him back home around midnight that night.

Before trial, Morales testified, he met with attorney Callahan two or three times at the Cook County Jail. He stated that at their first meeting, he told Callahan that he was with Katrina and Thomas at the time of the shooting and that he sold Thomas cocaine. Callahan told him he would follow up. Morales testified that the main topic of

discussion at their second meeting was Morales' alibi witnesses, Katrina and Thomas. Callahan again said he would look into this defense. Morales stated that at later meetings, he asked Callahan what he had learned, and Callahan told him not to worry because he had investigators working on it. He said that Callahan never provided him any information that he had learned from the Scimones. He did say, however, that Callahan told him at some point that Katrina "wouldn't pan out."

In response to questions by the Court, Morales stated that he did not question Callahan on why he did not think Katrina would work out. Nor did he question Callahan during the trial on why Thomas was not called to testify. Morales stated that he had assumed Thomas would testify and that he was "dumbfounded" when Thomas was not called as a witness.

**6.    Robert Callahan**

Morales' trial attorney Robert Callahan testified at the hearing in this case on October 27, 2005.

### a.    Callahan's background

He was admitted to the bar in 1994. He had been practicing law less than one year when Morales' mother retained him to represent Morales in the murder case. To handle Morales' case, Callahan was paid $600 per month, a total of approximately $6000 to $8000.

Before Morales' case, Callahan had been involved in only one other murder case. He was second chair at the trial in that case, which the defense won. He had also tried one other case to a jury, an attempted murder case that also resulted in a not

guilty finding.  It was unclear from Callahan's testimony whether he was first or second chair in that case.

**b.    The police reports**

The police reports that the prosecution in Morales' case produced to Callahan included a report of an oral statement by Morales to the police after his arrest on November 15, 1994.  Callahan testified that he reviewed the report when it was produced.  The report reflected that Morales was twenty-two years old at the time of his arrest.  The report stated that Morales denied involvement in the shooting.  The report stated that he told the police that he was with his girlfriend Katrina Scimone on the date of the shooting.  Morales said that she and her father picked him up at his home about 7:00 p.m. and drove him to their home, where they watched television.  He told the police they stayed there until Katrina's father drove him back home around 1:00 a.m., with Katrina accompanying.  Morales said that Katrina's father drove an older, white stick-shift car.  In other words, the police report clearly reflected that Morales had unequivocally claimed an alibi.

The same police report included a summary of an interview of Katrina by the police following the interview of Morales.  According to the report, Katrina told the police and a prosecutor the following:

- She lived in Elmwood Park, having moved there with her family two years earlier.  She knew Morales from the neighborhood where she used to live and knew him to be a Milwaukee King gang member and to carry a gun.

- She last saw Morales before her birthday, which was on October 13, 1994.  A friend named Juan Carasquillo called her from jail and told her to page

Morales and have him go to her home so Carasquillo could call him. Katrina did so. This was the only time Morales was inside her residence.

- She last saw Morales on October 21, 1994. (The Court notes an internal inconsistency in Katrina's statement, or at least in the police report, regarding the last date she had seen Morales).

- She did not see Morales on October 24, the day of the shooting. Morales started to leave phone messages for her a couple of days after that.

- She talked to Morales on October 28. He told her that "a few days prior 'we' were all shooting at [Satan Disciples] because they (the Milwaukee Kings) were at war with them and that a guy got shot."

- Morales told her the police were looking for him and were accusing him of the shooting. He asked her to lie for him and say he had been with her on the day of the shooting. He told Katrina to tell the police that she and her father picked him up at his sister's house at 6:30 or 7:00 p.m. on a particular date, took him to their house, and stayed there until they dropped him back off at 1:00 a.m. He told her to say they were engaged and asked her to describe her residence so he would know what it looked like if the police asked him.

- Katrina stated that her father drives a blue Pontiac 6000 with an automatic transmission and that she had never seen him with a white stick-shift car.

**c.     Investigation by Callahan**

Callahan's files contained no notes or other record of his work product, other than some sketchy notes in margins of certain police reports. His files also contained

no indication of any attempt to investigate the case, other than a memorandum of an interview of co-defendant Jacques by an investigator.  *See* Oct. 27, 2005 Tr. 31-37. And despite Callahan's relative inexperience, he did not claim, and the evidence contains no indication, that he consulted with any other lawyers – more experienced or otherwise – in connection with his representation of Morales.

Callahan testified that he did not interview Thomas Scimone or attempt to do so. He seemed to attribute this to the fact that Morales had never mentioned Thomas to him during their interviews.  Callahan cited no other reason; in particular, he did not contend that he made a determination not to interview Thomas because of issues regarding drug use.  Callahan also testified that he spoke with Katrina only briefly – for no more than five minutes – by himself, without an investigator or other "prover."

Callahan testified that he met with Morales on several occasions prior to trial.  He testified that Morales intimated that he was present at the shooting.  Specifically, he stated that at some point, he asked Morales how a 56-year-old man who did not appear to be a gang member had gotten killed, and that Morales replied, "we were really fucked up."  *Id.* 38.  Callahan testified, however, that Morales never squarely stated that he was involved in the shooting.

Callahan said that Morales did not specifically say he was with Katrina at the time of the shooting.  He said, however, that Morales asked him to talk to Katrina, saying "she's going to be wiling to help out."  Oct. 27, 2005 Tr. 18.

Callahan testified that he went, by himself, to speak with Katrina at the restaurant where she worked near Grand Avenue and Noble Street.  He conceded that he did not take a "prover" with him.  When later asked by the Court why not, Callahan

28

said that he sometimes investigates by himself "a small aspect [of a case] as a very preliminary matter" himself and that he "may have been going there just to locate [Katrina] and then send [his investigator] over there."  Oct. 27, 2005 Tr. 71.

Callahan said that he spoke with Katrina very briefly, for less than five minutes. He did not recall the substance of the conversation.  He stated that he drew the conclusion that "it wasn't working out alibi-wise" but could point to nothing other than a "gut feeling" as support for this.  Oct. 27, 2005 Tr. 20.  When later asked by the Court to elaborate, Callahan stated that he had a "really vague recollection of . . . coming out of there kind of deflated . . . ."  *Id.* 73.  He did not remember Katrina saying that she was not with Morales, though he believed he would remember this if she had said it. Callahan testified that he "really doubt[ed]" that he would have asked whether Katrina was with Morales and Thomas on the night of the shooting.  *Id.*  He also doubted that he had confronted Katrina with Morales' claim to have been with her on the night of the shooting.

Despite the fact that Morales' alibi claim to the police included Katrina's father Thomas, Callahan said he did not interview Thomas or attempt to do so.  Callahan testified that when he spoke with Morales, Morales never mentioned Thomas.  (On cross-examination, Callahan hedged a bit, saying that he was not absolutely positive but "highly doubt[ed]" that Morales had mentioned Thomas.  *Id.* 50.)  Callahan seemed to attribute the fact that he did not interview Thomas to his contention that Morales had never mentioned him.  Callahan said he had no awareness of any sort of drug usage by Thomas.  He did not suggest that anything regarding drug usage accounted for the fact that he did not interview Thomas.

Callahan did not claim that Morales stated or suggested that the alibi he had given the police was made-up. Callahan stated, however, that "at some point I think we [he and Morales] made a mutual decision that the alibi wasn't going to be the primary focus of the defense. So I think we did try to rectify [sic] some of those things and came to the conclusion that we had a much better chance of success with reasonable doubt." Oct. 27, 2005 Tr. 74-75. Callahan did not say when this took place. Logically, however, if such a conversation occurred, it likely would have been after Callahan's brief meeting with Katrina, given his testimony that it was that interview that led him to conclude that an alibi defense would not "work[ ] out."

Callahan testified that he had an investigator named Tom Romano who "read the file" and "attempt[ed] to locate witnesses," though he could not say what witnesses, other than possibly the two living victims of the shooting. *Id.* 26-28. Romano never met with Katrina or Thomas Scimone, however. Callahan believed it was possible Romano might have tried to speak with Katrina, though he recalled nothing of this (and Callahan's file reflected nothing of the sort). Callahan was relatively certain that he would not have asked Romano to speak with Thomas.

Callahan testified that Romano sent another investigator, Larry Pottle, to speak with Michelle Jacques – Morales' co-defendant – at the Cook County Jail. Jacques signed a statement. Callahan did not have the consent of Jacques' attorney to interview her. This made the interview improper, as any reasonable or experienced attorney would have known. As a result of the interview, Jacques' attorney filed a complaint against Callahan with the Illinois Attorney Registration and Disciplinary Commission.

30

### 7.    Thomas Scimone

Thomas Scimone testified before the Court on May 15, 2006.  He stated that he met Morales through his daughter Katrina.  Morales lived in the Scimones' old neighborhood in Chicago.  As of October 24, 1994, Thomas had been living in Elmwood Park for four to six months.

Thomas testified that on the night of the shooting, he and Katrina were with Morales.  They picked him up in Thomas's car, which he described as a white, stick-shift Volkswagen Jetta.  Thomas said he was using drugs at the time and that may have been why he picked up Morales.  They returned to Thomas's house in Elmwood Park, where he got high.  He does not believe that Morales left the house until he and Katrina took Morales home around midnight.

Thomas testified that the next morning, Morales called him and said he was wanted for a shooting.  He asked Thomas to help him.  Thomas testified that he and Katrina went to see Morales that evening.  He promised to help Morales but never followed through.  Thomas said he did not contact the police.

According to Thomas, he spoke once with Morales' attorney.  He first testified that he spoke to Morales' attorney around the time Morales was arrested and charged.  He later testified, however, that the conversation took place on the morning of the first day of Morales' trial.  Thomas said that he was in Morales' neighborhood.  A friend of Morales with the nickname of "Baby" or "Billy" asked him to speak to Morales' lawyer on the phone.  Thomas said the lawyer asked if he was with Morales at the time of the shooting; he responded that he was.  Thomas said he did not provide the lawyer any details but said that he picked Morales up fairly frequently to bring him to the Elmwood

Park house.

On cross-examination, Thomas testified that he was unaware that Katrina had testified before the grand jury and at trial, even though, he said, she still lived with him at the time. He also stated that he was unaware that Katrina had testified that she and Thomas were not with Morales on the night of the shooting; that Morales had asked her to provide a false alibi; and that Thomas drove a blue Pontiac and had never driven a stick-shift car. Thomas stated that he had owned a white 1983 Volkswagen Jetta and sold it to buy a blue Pontiac 6000. When asked, he stated that he did not know why Katrina testified that he was driving the Pontiac as of the time of the shooting.

After the hearing concluded, the Court asked the parties to make inquiry regarding vehicles registered to Thomas Scimone. Respondent's counsel submitted a report from an Attorney General's Office investigator who entered Thomas's name into the Illinois Secretary of State database. There was no record of any registration of a Volkswagen Jetta in Scimone's name. The records (which provide the make and year only, not the particular model of the car) showed five vehicles had been registered in Thomas's name:

-       A 1982 Oldsmobile was registered to Thomas, but the registration expired in 1991, long before the shooting.

-       A four-door 1987 Pontiac was registered to Thomas and, it appears, his mother Catherine Bianconi. The records do not say when Thomas first registered the car, but it had to have been prior to January 1994, because the records show the registration first expiring in that month. The registration expired, it appears, in January 1995, a few

months after the October 1994 shooting.

- A 1987 Dodge hatchback was registered to Thomas, with an
expiration date of September 2001 (several years after the shooting).
Neither the records nor the investigator's report indicate when Thomas
first registered the Dodge.

The other two vehicles appear to have been registered to Thomas long after the events in question.

When the Court belatedly realized that the Pontiac had been jointly registered to Thomas and his mother Catherine Bianconi, the Court considered the possibility that Bianconi might have owned a Volkswagen Jetta that Thomas drove. For this reason, in January 2010 the Court asked respondent to obtain information regarding vehicles registered by Bianconi. Those records reflected that from 1992 to 1994, Bianconi had a 1981 Buick coupe and that from 1993 to 1995, she had the 1987 Pontiac four-door previously mentioned. There was no record of her having a Volkswagen Jetta.

**8. Katrina Scimone**

The Court determined, after hearing the testimony of Callahan and Thomas Scimone, that it wished to hear the testimony of Katrina Scimone pursuant to the authority granted under Federal Rule of Evidence 614(a). With some difficulty, Katrina was located and served with a subpoena, and she came to court to testify on November 21, 2006. Because the Court had asked that she be called as a witness, the Court began by explaining to Katrina why she had been asked to come to court. *See* Nov. 21, 2006 Tr. 3-5.

### a.     The alibi issue

Katrina testified that she was approximately twenty years old at the time of Morales' 1996 trial.  She testified that she told a prosecutor, whom she believed was Michelle Simmons (the lead prosecutor at trial), that she did not remember if she had been with Morales on the night of the shooting or not.  Scimone testified that Simmons told her that if she lied, she would go to jail along with Morales.  "I was scared.  I didn't know anything.  I didn't remember anything.  I didn't remember any dates, anything."  Nov. 21, 2006 Tr. 7.

During her testimony at the hearing, Katrina initially stated that Morales did not call her after the shooting to ask her to say she had been with him that night.  She stated that her testimony at Morales' trial and before the grand jury in that regard was incorrect.  When asked why, then, she had given that testimony at Morales' trial, Katrina stated that it was "[b]ecause I was scared at the time [and the prosecutor] was telling me that I would go to jail."  *Id.* 10-11.

After further questioning at the hearing, however, Katrina stated that Morales likely did have a conversation with her, in which he asked her to tell the police that she had been with him the night of the shooting.  *Id.* 18-19.  She testified that at the time, she did not know one way or the other whether she had been with Morales on the night of the shooting, *id.* 20, and she said that she told Morales this when they talked.  *Id.* 21.  Katrina repeated her testimony that when she met with the prosecutor, she told the prosecutor that she did not know whether she had been with Morales on the night of the shooting.  *Id.* 20.  She stated that to this day, she does not remember whether she was

with Morales on that night. *Id.* 21. When asked if Morales had told her that he was present when the shooting took place, Katrina testified that she did not recall. *Id.* 19.

During her testimony at the hearing, Katrina was confronted with the fact that she had testified definitively at Morales' trial that she was not with him on the night of the shooting. *Id.* 22. When asked to explain this inconsistency with her stated lack of recollection, she testified that this was "[b]ecause she [the prosecutor] told me to answer yes or no. I didn't . . . know what to answer. I was young at the time." *Id.* 22-23. Katrina testified, however, that the prosecutor did not tell her which way to answer the question. *Id.* When asked again why, then, she had denied being with Morales rather than saying she was with him, she said, "Because I wasn't sure. I didn't know. I wasn't sure. I just said no." *Id.* 23. Katrina reaffirmed the statement in her affidavit that when the police and the prosecutor first came to see her, "I was scared. I didn't know what to say, so I just said no. But in my mind, I wasn't sure, so I just said no." *Id.* 24. She reaffirmed, however, that she had told the police that she was not with Morales on the night of the shooting. *Id.* 42.[2]

### b.    Contact with Morales' attorney

Katrina testified that Morales' attorney came to talk to her at the restaurant where she worked. She said that spoke with him "a few times." He asked whether she was with Morales on the night of the shooting. She said she told him that she did not

---

[2] Katrina testified at the hearing that at the time of the shooting, Thomas (her father) was driving a green or teal 1994 Oldsmobile Cutlass. Nov. 21, 2006 Tr. 48-49. This clearly was incorrect. Thomas at one point had an Oldsmobile registered in his name, but the registration expired in 1991. The Court chalks up this error to the passage of time since the events in question.

remember.  She said she told Morales' attorney this on more than one occasion.

### c.  Katrina's receipt of benefits from the prosecution

Prior to Katrina's testimony at the hearing on Morales' habeas corpus petition, there had never been any indication that she or her family had received any benefit in connection with her testimony as a prosecution witness at Morales' trial.  During her testimony before this Court on November 21, 2006, however, Katrina volunteered information about payments that she had never previously disclosed.  Katrina's testimony about her phone conversation with Morales was read to her, and as noted earlier, she was asked whether Morales had in fact asked her to tell the police she was with him at the time of the shooting.  She said:

> SCIMONE:  Okay.  I'm going to be honest.  I don't know if he said that I was there.  I don't remember everything.  But when I was with Michele Simmons [the prosecutor], she went over - - that's all coming back to me. She went over that with me, and - - does it say anything in there about, like, money or anything?
>
> THE COURT:  I haven't gone on to the rest of it yet.
>
> SCIMONE:  About, like, relocation money or - -
>
> THE COURT:  Say it again.
>
> SCIMONE:  About relocation money or something like that.  Because she told me in court when I had the trial not to say that they gave me a check or anything; and I remember her going through all that with me and saying what happened, what time.  I remember that in her office.

Nov. 21, 2006 Tr. 14-15.  Upon further questioning, Katrina said that the prosecutor had given her father (Thomas) a check for relocation and that the amount was perhaps $2,000, though she was unsure.  She also repeated that a prosecutor, whom she "believe[d]" to be Michele Simmons, told her not to disclose the payment.  *Id.* 15-17.

After the hearing, the parties stipulated that Callahan would testify that the prosecution had not disclosed to the defense at Morales' trial that relocation fees were paid to any witness, specifically to Katrina, and that the prosecution had never disclosed that Katrina had stayed in a hotel paid for by the state's attorney's office during the criminal trial.

**c.      Documentary evidence regarding payments to Katrina**

Katrina's testimony before the grand jury that indicted Morales had not been located at the time she testified at the hearing, but it was introduced by respondent at a later date.  In that testimony, which took place on November 21, 1994, Katrina was questioned by a prosecutor named Carmen Aguilar.  Near the end of her testimony, Katrina was asked, "Did we ever promise you anything in return for your testimony here?," and she responded, "No."  Resp. Ex. L at 14.

Following Katrina's contrary testimony at the evidentiary hearing in this case, the Court asked respondent to request records from the Cook County State's Attorney's Office regarding any payments to her or for her benefit.  Respondent filed five exhibits. These include a memorandum that appears on its face to have been prepared by prosecutor Simmons; a handwritten "approval form"; an "intake sheet" containing information maintained by the victim / witness unit of the state's attorney's office; a document in spreadsheet format; and a phone message slip addressed to Simmons.

- *Simmons' memorandum*, which she appears to have written by hand and then signed, is on a preprinted form entitled "Relocation of Witness."  Though the memorandum is undated, its text indicates that it was prepared after Morales' trial.  It states that "Katrina Scimone testified at D's jury trial that D admitted to her about the

37

shooting and told her what to tell the Police when he uses her as an alibi. She testified that D was not with her and that he told her exactly what to say." Suppl. Ex. B. Under "reason for relocation," the memo states that "[s]he has received <u>numerous</u> threats from the D's gang. ASA has actually heard some of the threats on her voice mail. The gang continued threatening her after she testified on 5/13/96 [sic] and D was found guilty." *Id.* (emphasis in original).[3]

- *The approval form*, dated May 20, 1996, lists basic information about the case and Katrina and identifies Simmons as the "requesting ASA." The form states, under the heading "previous relocations / hotel extensions," that Katrina stayed at the Marriott O'Hare hotel – evidently at the expense of the state's attorney's office – from May 15 through May 20, 1996. The Court notes that May 15 was the day before Katrina's testimony at Morales' trial. The form requests approval for "first months [sic] rent" and "security deposit" and is signed by two supervisors, John Hynes and Neil Linehan. Suppl. Ex. C.

- *The intake sheet* includes detailed personal information about Katrina, states that a request for relocation funds was made by Simmons on May 20, 1996, and identifies two payments on May 29, 1996 of $600 each, for rent and a security deposit, to "Jorene Cicero." Suppl. Ex. A. The form reflects that Katrina's "current housing" was with her "boyfriend's parents," and it lists an address, 2942 N. 76th Avenue, Elmwood Park, and a phone number, 708-452-1230. The second page of the form lists a different address for Katrina, 2520 N. 75th Court, Elmwood Park. A handwritten

_____

[3] The Court notes that the memorandum is incorrect in this regard; Katrina testified at Morales' trial on May 16, 1996, not May 13, 1996.

notation at the bottom of the second page states: "Relocate - May 31, 1996, 2520 N. 75th Ct., Elmwood Pk. IL." *Id.* This suggests that the 76th Avenue address was Katrina's prior address and the 75th Court address was the address to which she was relocated. The fourth document, a "person cost report," simply lists the two $600 payments. Suppl. Ex. E. None of the documents reflects whether the payments were in cash or by check or money order.

- *The phone message*. Respondent also submitted a handwritten phone message slip to prosecutor Simmons from detective Karen Hansen, one of the lead detectives on the case. Suppl. Ex. D. Respondent did not attempt to explain the provenance or import of this document. The form is dated "1/23" with no year listed. It notes Hansen's pager number and includes the following message:

> Case 94-29937
> Katrina Scimone called me - Efrain Morales has been calling her - could you please contact her and help her out. Thanks. She's at 252-1652 - living with her grandmother.

The phone number listed on the message is a different number from the one listed for Scimone on the "intake sheet" dated May 30, 1996. The most reasonable inference is that the message is from January 23, 1995 or that date in 1996 – in other words, before Morales' criminal trial.

- *The felony review notes.* After *in camera* inspection, the Court ordered the state's attorney's office to produce notes in or on the "felony review" file prepared at or around the time Morales was charged. Suppl. Ex. F. The notes appear to have been prepared by a prosecutor named "C. Hufford." The notes provide some information that helps in interpreting the documents concerning the relocation payments. The felony

review notes include a reference to Katrina, listing an address of 7301 West Fullerton, Elmwood Park, and a phone number of 708-456-0811.  On the same form, handwritten in different ink – likely at a later date – the following notation appears:

> Boyfriend's mo - Jorene Cicero
> <u>Jim</u>                (708) 452-9310

The Court also notes as an aside that in the same hand, the notes include the following notation to the right of the reference to Jorene Cicero:

> Thoman [sic] Scimone - Father
> Truck driver
> GMO - 2610 W. Superior - Catherine Bianconi
> (312) 252-1652

This reference appears to identify Catherine Bianconi as Katrina's grandmother – abbreviated "GMO," similar to the same annotator's reference to Katrina's boyfriend's mother as "mo" – and the Court also notes that the phone number listed for Bianconi is the same number listed by detective Hansen in the previously described phone message slip.[4]  The Court will return to this reference later.

The police report that summarized Katrina's initial statement to the police in November 1994 listed her address as 7301 West Fullerton, with the same 708-456-0311 phone number listed on the felony review notes.  The report states that Katrina was accompanied to the police station by Jorene Cicero, a 51 year old woman with an address of 2942 76th Avenue, Elmwood Park, and a phone number of 708-452-1230.  That is the address and phone number that was listed for Katrina on the State's

---

[4]  The Court also notes that during her testimony at Morales' trial, Katrina testified that her grandmother "lives on Superior," the address for Bianconi listed in the felony review notes.  Trial Tr. C113.

Attorney's Office intake sheet dated May 2006.  According to the police report, Cicero told the police she is "like a mother to Katrina" and told Katrina to tell the detectives the truth.

- *Summary of the records regarding payments / benefits*.  Putting all of this evidence together, it indicates that at the time of the shooting, Katrina was living with her father at 7301 West Fullerton.  Sometime thereafter, it appears, she moved in with Jorene Cicero at 2942 76th Avenue.  It is likely that Ms. Cicero was the mother of Katrina's boyfriend, as referenced on the intake sheet.  The intake sheet appears to state that the two $600 relocation payments were made to Ms. Cicero.  It also appears, though it is not entirely clear, that Katrina used the payments to move to 2520 N. 75th Court, as referenced on the intake sheet.  And it appears that the relocation payments were made about two weeks after Katrina's testimony at Morales' trial.  In addition, it appears that the state's attorney's office paid for a five-day stay by Katrina at the Marriott O'Hare Hotel that began just before her testimony at Morales' trial.

### Assessment of the evidence

The Court has made judgments regarding the reliability of the evidence submitted and the credibility of the witnesses who testified, based on their demeanor, their particular biases and interests, the reasonableness of their testimony in light of the other evidence, any inconsistencies, and other factors appropriately considered in assessing credibility.

**1.      What Morales told Callahan**

Morales testified that he told Callahan that at the time of the shooting, he was at

the Scimones' house with Katrina and Thomas.  The Court finds credible Morales'

testimony about what he told Callahan; it is consistent with what Morales told the police

immediately after his arrest.

Callahan claimed that Morales never mentioned Thomas and never said he was

with Katrina.  This testimony was not credible.  It supposes that despite the prominence

of Morales' alibi claim in the police report, Callahan never discussed the issue with him

and Morales never brought it up either.  This borders on the absurd.[5]  Callahan had no

real memory about what Morales had said, and he had a significant motivation to

rationalize or justify the relative absence of an investigative effort on Morales' behalf.

The Court also did not find credible Callahan's testimony that Morales intimated

that he was present or involved in the shooting.  Morales has consistently maintained

his innocence, and there is no basis to believe that he told Callahan otherwise.

Callahan's contrary suggestion was unsupported by any notes in his file.  His demeanor

at the hearing suggested that he was groping to come up with answers that put him in

the best light rather than testifying from memory.  In addition, Callahan did not act

consistently with his contention about what Morales said.  Among other things,

Callahan's statement that he felt "deflated" after talking to Katrina about an alibi

defense is largely inconsistent with his contention that Morales indicated he was

involved or present at the shooting.

**2.      What Callahan did and what he learned**

Callahan's testimony that he spoke with Katrina was believable – largely

---

[5] The only other conceivable possibility would be that Morales disavowed the alibi, a contention Callahan did not make.

because it was corroborated by Katrina – but his testimony regarding what happened at their meeting was not believable. Again, Callahan had no notes or record of the meeting. Katrina was, in general, a far more credible witness who largely lacked the same sort of bias or interest that led Callahan to unconsciously or consciously slant his testimony.

The Court found credible Katrina's testimony that she told Callahan she did not recall whether she was with Morales the night of the shooting. That testimony is consistent with her stated recollection of the underlying events. It is also, the Court notes, consistent with Callahan's statement that after talking with Katrina, he felt "deflated" and that an alibi defense would not work out.

The Court found credible Callahan's testimony that he never talked to or attempted to talk to Thomas Scimone, though not (as noted earlier) his suggestion that this was because Morales never mentioned Thomas. Thomas' testimony that he had talked to Morales' lawyer via phone was not believable. His story was not particularly plausible on its face, and having seen and heard Thomas testify, the Court did not regard him as a generally credible witness.

One might argue that Callahan's admission that he never spoke with Thomas and spoke only briefly with Katrina lends credibility to other testimony by Callahan that the Court has found to lack credibility: why would an attorney admit such slipshod work were it not true? The Court does not accept this proposition. As the Court has noted, Callahan largely lacked memory of the particulars of his work as Morales' attorney. In describing his limited contact with the Scimones, the Court believes, Callahan was simply conceding adverse facts that he was aware could be proven via witnesses other

than Morales.

### 3. Katrina and Thomas Scimone and the claimed alibi

The testimony regarding the alibi that Morales and Thomas Scimone gave at the evidentiary hearing in this case was not credible. Both of them tied the alibi to the claim that Thomas was driving a white Volkswagen Jetta at the time (that is also what Morales had told the police after his arrest in 1994). That claim is undercut by the documentary evidence, which reflects no such vehicle registered to Thomas or his mother.

One cannot, to be sure, absolutely rule out the possibility that the Secretary of State records are incomplete. It is significant, however, that the documentary evidence appears to show that at the time of the shooting, Thomas had a Pontiac. This is consistent with what Katrina told the police just after the shooting when interviewed about Morales' alibi claim.[6] In short, the evidence from the Secretary of State tends to show that Katrina's statement to the police about the car was credible and that Thomas did not actually drive a white Jetta then. The fact that both Morales and Thomas testified to the same, non-credible particulars of the alibi story tends to suggest that the alibi was fabricated.

The Court acknowledges that Thomas seemed quite confident in his testimony that he was driving a 1983 white Jetta at the time of the shooting. The documentary evidence, however, undercuts his contention. It is also noteworthy that Thomas

---

[6] Katrina's testimony at the evidentiary hearing in this case that Thomas drove an Oldsmobile was, in the Court's estimation, an error that resulted from the passage of time. Thomas did drive an Oldsmobile, but it was before the time of the shooting, not at that time.

testified at the hearing that he sold his Jetta to buy a Pontiac. The documentary evidence showed that he acquired the Pontiac in 1993 or, at the latest, in January 1994, months before the shooting. Thus if Thomas's testimony that he owned a Jetta and his testimony about the sequence of ownership were correct, he no longer would have had a Jetta at the time of the shooting.

The Court also notes that Thomas testified that he and Katrina went to Morales' home the day after the shooting, after Morales called to ask for help. This was contrary to Katrina's testimony at Morales trial, and the Court did not find Thomas' testimony credible in this regard.

The Court found credible Katrina's testimony at the hearing that after the shooting, Morales asked her to say they were together that night. Her testimony in this regard was consistent with her statement to the police in November 1994. The Court considered Katrina to be a largely credible witness, albeit one with some understandable memory gaps when testifying about events that took place in 1994.

Katrina testified at Morales' trial and before the grand jury that indicted him that she was not with Morales the night of the shooting. In her 1998 affidavits and at the hearing in this case, by contrast, Katrina stated that she did not recall back in 1994 and does not recall now whether she was with Morales that particular night. The Court found credible Katrina's testimony at the hearing (and thus her statements in the affidavits). That does not mean that the Court believes that Katrina gave knowingly false testimony at the trial. Rather, it is likely that Katrina testified as she did because

she felt she had to give a definitive answer[7] and believed it was more probable that she had not been with Morales the night of the shooting.

That said, the evidence is clear, and the Court finds, that Katrina was not told by the police or prosecutors what to say. Though she was pushed to give a definitive answer, the Court is unpersuaded that she was pressured to give a particular answer.

The Court also notes another matter of significance regarding Katrina. Neither in her testimony at the hearing nor in her 1998 affidavits did Katrina disavow her trial testimony that Morales importuned her to support an alibi for him or her testimony that Morales told her that he was present when the shooting took place. She said, on the latter point, that she no longer recalled, but she did not back off from her trial testimony on the point.

## 4.    Katrina's receipt of benefits from the prosecution

The evidence showed that prosecutors provided monetary and other benefits to Katrina in connection with her cooperation in the prosecution of Morales. First, it is clear from the evidence that the state's attorney's office put Katrina up in a hotel for five days during Morales' trial. Second, it is also clear that, after the trial, the state's attorney's office gave her money to relocate. Finally, it is clear that this was not disclosed to Morales or his trial counsel.[8]

---

[7] The Court found credible Katrina's testimony at the hearing that she felt pressured by police and/or prosecutors to give a definitive answer and that she was also concerned by their statements that she could be prosecuted if she lied.

[8] Respondent has filed a stipulation that Katrina testified during Morales' trial that she did not stay at home the night before her testimony and that an investigator from the state's attorney's office picked her up and brought her to court that day. *See* Trial

(continued...)

The Court also finds it more likely than not that Katrina was told before the trial that she would be put up in a hotel during the trial. The alternative hypothesis makes little sense. It is not entirely clear from the evidence, however, exactly when the relocation benefits that were paid to Katrina after the trial were first promised to her. Katrina indicated in her testimony at the hearing that she was told before the trial that she would be given money to relocate. The records produced by the State's Attorney's Office suggest otherwise: prosecutor Simmons' memo seems to indicate that the relocation payments were prompted by threatening phone calls that Katrina got after the trial. On the other hand, a document included in the same records refers to contacts between Morales and Katrina prior to the trial that she reported to a detective and that the detective, in turn, reported to the prosecutor. This suggests the possibility, as Katrina testified, of a discussion between her and the prosecutor before the trial regarding the possibility of relocation later.

Because the documentary evidence was obtained only after Katrina testified at the hearing in this case, there was no opportunity to ask her follow-up questions based

---

[8](...continued)
Tr. C115. It is unclear what respondent wants the Court to make of this; the testimony and stipulation are not discussed in respondent's post-hearing brief. If respondent means to suggest that this amounted to disclosure to Callahan that Katrina was receiving benefits in connection with her testimony, that is utterly unpersuasive. For all that a reasonable attorney would have known from this testimony, Katrina could have been staying with a friend or relative. The Court also notes that the fact that Katrina had not stayed at home did not come out on direct examination by prosecutor Simmons. Rather, it was disclosed only because Callahan was allowed to ask on cross-examination – over prosecutor Simmons' objection – how Katrina had gotten to court (she responded that detectives had picked her up but did not say from where). Trial Tr. C103.

on these records.  Further testimony might have led to clarification of some the discrepancies between her testimony and the records.

The Court finds credible, however, Katrina's testimony that the subject of relocation benefits was discussed with her by a prosecutor before the trial.  The testimony was otherwise uncontradicted, and Katrina's demeanor while testifying enhanced her credibility generally.

The Court also notes that the manner in which the entire topic of Katrina's receipt of benefits came up buttresses her overall credibility on this and other topics, if not on the specifics and details.  Before Katrina testified about her receipt of benefits, there had been no disclosure of them.  Based on the Court's close observation of Katrina when she testified, her testimony in which she brought the payments to the Court's attention was spontaneous and unrehearsed.   And when inquiry was made after her testimony, her previously undisclosed receipt of payments was shown to be true, at least generally if not in all particulars.

The Court also found credible Katrina's testimony about what she was told to say if asked whether she had received or been promised in connection with her testimony.  Specifically, she was told not to mention the payments.  Again, there was no contrary evidence.  In addition, and perhaps more importantly, this testimony is corroborated by the fact that the trial prosecutors did not disclose to the defense (as they plainly were required to do) that she had received or been promised benefits in connection with her testimony as a prosecution witness.

It is, of course, possible that Katrina got the timing wrong and that her discussion with prosecutors took place only after the trial.  But the only way her credible testimony

that a prosecutor told her not to disclose the payments or promised payments while testifying makes sense is if the discussion about payments took place before trial.[9]

Despite the inexcusable non-disclosure of the benefits given to Katrina by the prosecution, the Court does not regard those benefits as any kind of a payoff for favorable testimony. There was a legitimate basis for prosecutors to give Katrina funds to allow her to relocate and to keep her at a hotel during trial. There was documentation that she had gotten verbal threats, and her testimony at trial on that score (which the trial judge struck from the jury's consideration) was believable.

The Court cannot rule out the possibility that Katrina received other benefits; her testimony suggests there may have been payments in addition to those referenced in the records belatedly produced. In this regard, it is noteworthy that although those documents refer to the five-day hotel stay, there was no documentation regarding a request for or approval of that payment. In other words, but for the fact that the approval form for the relocation payments had a space for the preparer to identify prior payments, there would have been no documentation of the hotel stay at all. This suggests that the victim / witness unit sometimes provides benefits to witnesses or victims for which no record is generated. But there is no testimony clear enough to permit the Court to conclude that Katrina got any benefit other than the hotel stay and the relocation payment.

_____

[9] The Court is not simply bootstrapping one finding about a disputed fact into another. The credibility of Katrina's testimony that she was told not to disclose the benefits or promise of benefits is supported by, among other things, the prosecution's *actual* and undisputed nondisclosure of the paid-for hotel stay that started before Katrina's testimony at the trial.

Morales has not made a *Brady* claim in his petition.  In fact, Morales expressly declined to add such a claim to his habeas corpus petition after the evidence of payments to Katrina came out.  He likewise did not attempt to go back to state court to assert a *Brady* claim there.  One might wonder why, then, the Court has spent so much time on the evidence relating to the undisclosed benefits and when they were made.  There are two reasons.  First, as the Court has discussed, Katrina's spontaneous disclosure of the payments and the subsequent confirmation of their existence buttresses her credibility generally.  Second, the matter is relevant to Morales' perjured testimony claim and his contention that he is actually innocent and that this excuses certain alleged procedural defaults.

5.      **The testimony of Aponte and Gonzalez**

Aponte's testimony naming Moncada as the second shooter is of dubious credibility.  Aponte indicated that she started to correspond with Morales "[a] couple of years" after her conversation with Moncada, meaning approximately 1996.  Moncada did not die until mid-1998, nearly two years later.  But Aponte did not sign an affidavit regarding her purported conversations with Moncada until April 1999.  In other words, neither she nor Morales came forward with Moncada's purported confession until after his death.  Neither Aponte nor Morales provided any explanation for the delay.

The Court found Gonzalez's testimony at the hearing unconvincing.  Specifically, the Court is unpersuaded by his explanation of why he expressly implicated Morales at the time of his guilty plea if, as he now claims, Moncada actually was the second shooter.

**Discussion**

A person convicted in state court may obtain a writ of habeas corpus on a claim that was adjudicated on its merits in state court only if the state court's adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(b). A decision is "contrary to" Supreme Court precedent if, among other things, "the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases." *Williams v. Taylor*, 529 U.S. 362, 405 (2000). And "[t]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003).

Morales asserts three claims. First, he maintains that Callahan rendered ineffective assistance at trial. Second, Morales contends that he was convicted based on perjured testimony. Third, he argues that the imposition of consecutive sentences for murder and attempted murder violated his right to trial by jury, as interpreted in *Apprendi v. New Jersey*, 530 U.S. 466 (2000). The Court will address these claims in reverse order.

**1.      Consecutive sentences**

Morales argues that the imposition of consecutive prison terms violates the

constitutional principles set forth in *Apprendi* because it was based on findings not made by a jury. The Seventh Circuit has held, however, that *Apprendi* does not apply retroactively on collateral review. *See, e.g., United States v. Flagg*, 481 F.3d 946, 950 (7th Cir. 2007). Because direct review in Morales' case was completed in 1998, and his conviction and sentence were already being reviewed collaterally in June 2000, when *Apprendi* was decided, his *Apprendi* claim does not provide a basis for issuance of a writ of habeas corpus. *See also, e.g., Curtis v. United States*, 294 F.3d 841, 843-44 (7th Cir. 2002).

## 2. Use of perjured testimony

Morales contends that his due process rights were violated because Jose Nevarro and Katrina Scimone presented perjured testimony at his trial. *See* 2d Am. Pet. at 27-32. The Court agrees with respondent that Morales procedurally defaulted this claim. Though Morales asserted the claim in his second post-conviction petition, he did not refer to the claim on his appeal from the denial of that petition. As the Court has noted, the state appellate court found that Morales had "abandoned" this and certain other claims he asserted in the petition. *Morales III*, 339 Ill. App. 3d at 560, 791 N.E.2d at 1127-28. Morales has not challenged that finding.

Morales argues that his procedural default should be excused because he is actually innocent of the offenses of which he was convicted. "'Actual innocence' is not itself a [federal] constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." *Herrera v. Collins*, 506 U.S. 390, 404 (1993). Morales must establish that in

light of the new evidence he has offered, "it is more likely that not that no reasonable juror would have found [him] guilty beyond a reasonable doubt." *Schlup v. Delo*, 513 U.S. 298, 321 (1995).

This is a difficult hurdle to clear, and Morales has not done so. He was identified as the second shooter at trial by two eyewitnesses. Their identifications were subject to attack based on the surrounding circumstances, but a jury considered those challenges and found them wanting. Morales has provided no viable new evidence tending to undercut the identifications the eyewitnesses made at trial or the circumstances of their pretrial photographic identifications. The evidence that eyewitness Nevarro told others that he falsely implicated Morales all came from convicted felons and is thus of suspect credibility. No statement by Nevarro was offered in connection with the present habeas corpus petition; indeed, there is no indication that he was ever confronted with his purported statements to others.

In addition, as the Court has already discussed, Morales' alibi claim is corroborated only by the testimony of Thomas Scimone, which the Court has found to lack credibility. To this day, Katrina Scimone has never said that she was actually with Morales on the night of the shooting; the best (for Morales) that she has ever said is that she does not recall. This is hardly support for Morales' claimed alibi. In addition, as the Court has noted, Katrina has never disavowed the most damaging testimony she gave at Morales' trial – specifically, her testimony that he admitted being present at the shooting and her testimony that he repeatedly importuned her to provide an alibi for him. And given the fact that Katrina has not disavowed that testimony even after disclosing that the prosecution relocated her and put her up in a hotel, there is no basis

to say that those benefits influenced the testimony she gave that was the most damaging to Morales.

Finally, the evidence that someone other than Morales was the second shooter is insufficient, even when considered together with the other evidence Morales has marshaled, to meet the standard set forth in *Schlup*. Gonzalez now says that Morales was not involved, but the Court has found his testimony to lack credibility in light of, among other things, his admission under oath at the time of his guilty plea in 1996 that Morales was the second shooter. And the evidence that Moncada was actually the second shooter was never brought forward until after Moncada was known to be dead, which makes its believability suspect.

Even were Morales able to show "actual innocence" as the Supreme Court has defined that term sufficient to excuse his procedural default, he has not made out a viable federal constitutional claim based upon the use of perjured testimony. The claim is based on the Supreme Court's decisions in *Napue v. Illinois*, 360 U.S. 264, 269 (1959), and *Pyle v. Kansas*, 317 U.S. 213, 215-16 (1949). But *Napue* requires a showing that the prosecution *knowingly* presented false testimony, a showing that Morales has not made – indeed, he did not even allege it in his habeas corpus petition. *Napue*, 360 U.S. at 269; *see also, e.g., Moore v. Casperson*, 345 F.3d 474, 494 (7th Cir. 2003).

**3.     Ineffective assistance of trial counsel**

The Sixth Amendment guarantees to an accused the right to effective assistance of counsel. A claim of ineffective assistance requires a showing that counsel's "acts or

omissions were outside the wide range of professionally competent assistance" and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 448, 690, 694 (1984).

Morales' claim of ineffective assistance is premised largely upon Callahan's ineffective interview and impeachment of Katrina Scimone and his failure to investigate Thomas Scimone and call him to testify at trial. Specifically, Morales contends that Callahan failed to impeach Katrina with her statement that she did not recall whether she was with Morales at the time of the shooting and that Callahan failed to have a "prover" with him when he interviewed her. *See* 2d Am. Petition, Claim I.B & I.D at 18-23, 25. He also contends that Callahan failed to investigate Thomas Scimone and call him to testify. *See id.* Claim I.C at 23-25. Morales also asserts that Callahan failed to subpoena police "street files," gunshot residue test information, medical and hospital records of Crawford and Nevarro, or the phone records of Katrina and of Morales. *See id.* Claim I.D at 25. He also asserts that Callahan failed to keep adequate notes and that this impeded his ability to cross-examine witnesses. *Id.* Morales also asserts other contentions in his post-hearing brief, which the Court will address in a later section of this decision.

The state courts have ruled on the merits of Morales' claims regarding Callahan's dealings with Katrina and Thomas Scimone, or at least on parts of those claims. As discussed earlier, the state appellate court ruled in connection with Morales' first post-conviction petition that Morales' was not prejudiced by Callahan's actions vis-

a-vis Katrina.  The state appellate court also ruled in connection with Morales' first post-conviction petition that Callahan had not performed deficiently in connection with his failure to call Thomas to testify.

### a.    Katrina Scimone

Morales argues that Callahan acted ineffectively in failing to have a "prover" present when he interviewed Katrina and in failing to impeach her at trial with the statement she made to him during the interview.  These claims are interrelated.  As a practical matter, Callahan could not have impeached Katrina with the arguably inconsistent statement that she made to him without having a "prover" or investigator who could testify at trial to prove up her statement to him.  It would have been reckless for Callahan to attempt to impeach Katrina with a statement she made to him unless there was some other witness available to testify about the statement if she denied making it.

*Procedural default*.  Respondent contends that Morales procedurally defaulted the aspect of his claim concerning Callahan's failure to have a prover present.  The Court rejects this argument.  In his amended post-conviction petition, Morales effectively asserted both points.  Though he did not make specific reference to the absence of a prover or investigator, he said that when Callahan interviewed Katrina, he "did not take any notes, tape record the conversation, nor made any reference in his trial file."  Resp. Ex. G (amended post-conviction petition) ¶¶ 13 & 23.  He also made both points in his appeal to the Appellate Court.  Resp. Ex. J (appeal brief) 18 ("Callahan did not have a 'prover' present as he interviewed Katrina, therefore he could not indicate at trial that she was not telling the truth.").  In addition, and just as

importantly, when the Appellate Court considered Morales' post-conviction petition, it did not find that he had defaulted either part of his claim. Rather, the court squarely referenced Morales' contention that Callahan "was ineffective for failing to have a 'prover' present when he interviewed Katrina" and rejected that claim on the merits. *Morales II*, slip op. at 8. If the last state court to consider a constitutional claim addresses it on the merits, procedural default poses no barrier to a federal court's consideration of the claim. *See, e.g., Pole v. Randolph*, 570 F.3d 922, 937 (7th Cir. 2009) (citing *Harris v. Reed*, 489 U.S. 255, 263 (1989)); *Malone v. Walls*, 538 F.3d 744, 752 n.7 (7th Cir. 2008) (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991)).

Respondent also points to the decision dismissing Morales' second post-conviction petition, in which he again argued that Callahan was ineffective for (among other things) interviewing Katrina without a prover. Respondent suggests that the trial judge concluded that Morales had waived the claim because he did not raise it during earlier proceedings. In view of the fact that Morales raised the claim in his first post-conviction petition and the state court dealt with the claim on its merits, the Court is hard pressed to see why the law of procedural default would penalize Morales for having failed to assert the same claim for a second time in a second post-conviction petition. In any event, the trial judge's decision on the second post-conviction petition is not so clear as respondent suggests. The judge determined that certain of Morales' claims, including his ineffective assistance of trial counsel claim, were barred by principles of *res judicata* and waiver. It is unclear whether the judge believed that the ineffective assistance claim had been decided or that Morales had never raised it.

Because it is clear that Morales *had* raised the claim in his first post-conviction petition and appeal, this Court reads the state trial judge's decision on the second post-conviction petition as concluding that the claim regarding Katrina was barred by *res judicata*. A *res judicata*-based ruling is not a bar to federal habeas review. *See, e.g., Yancey v. Gilmore*, 113 F.3d 104, 105 (7th Cir. 1997).

*Merits*. As discussed earlier, in affirming the denial of Morales' first post-conviction petition, the Illinois Appellate Court did not address whether Callahan had performed deficiently in dealing with Katrina. Rather, it went directly to the issue of prejudice, concluding that Morales was not prejudiced by Callahan's actions. In particular, the court said that "[t]wo eyewitnesses identified defendant as one of the shooters, *and the physical evidence supported the eyewitness testimony*." *Morales II*, slip op. at 9 (emphasis added). The court characterized Katrina as merely a corroborating witness whose testimony "was not critical to a finding of guilt." *Id.* (emphasis added). Based on these determinations, the court concluded that Morales had failed to show a reasonable probability that his case would have come out differently had Callahan impeached her. *Id.*[10]

---

[10] In *Morales III*, the appeal from the denial of Morales' second post-conviction petition, the state appellate court said that Callahan did not act unreasonably in failing to interview Katrina in 1996 because he "had no reason to believe in 1996 that Katrina would equivocate in 1998." *Morales III*, 339 Ill. App. 3d at 564, 791 N.E.2d at 1131. But the court in *Morales III* was addressing the claimed ineffectiveness of *appellate* counsel for failing to argue that trial counsel was ineffective, not the ineffectiveness of trial counsel. *Morales III* was not the last state court decision on the merits on the claim regarding trial counsel; that was *Morales II*. In any event, this determination by the court in *Morales III* was unreasonable, or at least unreasonable based on the evidence presented, as it completely missed the point. The point was not whether Callahan could anticipate that Katrina would say something different two years later. Rather, it

(continued...)

As will become clear later in this decision, this Court agrees that Morales was not prejudiced by Callahan's actions. But as a threshold matter, Morales has shown by clear and convincing evidence that the particular factual determination upon which the state appellate court premised its conclusion was incorrect, *see* 28 U.S.C. § 2254(e)(1), and that the court's decision reflects an unreasonable determination of the facts in light of the evidence presented in the state court proceedings, *see id.* § 2254(d)(2).[11]

In particular, contrary to the state appellate court's determination, the physical evidence presented at Morales' trial did not "support[ ] the eyewitness testimony" as it related to Morales. The core of the eyewitness testimony was the identification of the particular individuals claimed to have done the shooting – Gonzalez and Morales – not the statement that there were two shooters, a matter that was undisputed. It is clear that nothing in the physical evidence "supported" the identification of Morales. Rather, the physical evidence confirmed only that there were two shooters and that some of the cartridges had come from the nine millimeter handgun found in Gonzalez's home. The state appellate court's partial reliance on this patently erroneous factual finding renders its conclusion that Morales was not prejudiced unreasonable within the meaning of section 2254(d)(2). *See, e.g., Wiggins*, 539 U.S. at 528. A court reasonably could

_____

[10](...continued)
was whether Callahan should properly interview a witness who police reports indicated would give highly damaging testimony and who Morales said could provide him an alibi. For either or both reasons, there was no reasonable or legitimate excuse for Callahan not to interview her properly.

[11] The Court notes that when a state court's factual conclusion is rejected under section 2254(d)(2), it effectively negates the presumption of correctness that otherwise would attach to the state court's findings. *See Wiggins v. Smith*, 539 U.S. 510, 528 (2003).

come to the conclusion that Callahan's actions relating to Katrina did not prejudice Morales in the way *Strickland* requires, but it could not reasonably reach that conclusion by the route that the state appellate court took.

The Court proceeds to evaluate whether Callahan's conduct vis-a-vis Katrina Scimone fell below an objective standard of reasonableness. *Strickland*, 466 U.S. at 688. Because the state court did not address this issue, the Court considers it *de novo. See, e.g., Carlson v. Jess*, 526 F.3d 1018, 1024 (7th Cir. 2008).

The Court concludes that Callahan acted unreasonably in failing to have an investigator or "prover" present when he interviewed Katrina. The starting point is the recognition that Katrina was important for more than one reason. First, she was a likely prosecution witness, because her statements to the police inculpated Morales. Second, she was a potential defense witness, because Morales had identified her (to both the police and Callahan) as supporting his alibi claim.

There was nothing necessarily unreasonable or deficient about Callahan initially interviewing Katrina by himself. But once she told him that she did not know whether she had been with Morales the night of the shooting – a less inculpatory factual scenario than the one she had given the police – a reasonable attorney would have returned along with a witness (a "prover") to reconfirm the statement. Katrina's statement to Callahan that she did not know whether she was with Morales the night of the shooting, a statement that the Court has found credible, could have been used to impeach her more definitive statement to the police that she was *not* with Morales, a statement she repeated in her testimony at his trial. In view of the police report summarizing Katrina's inculpatory statement to the police and the fact that she was

listed as a prosecution witness, any reasonable defense attorney would have realized that the prosecution would attempt to prove at trial that Morales had tried to concoct a phony alibi. Evidence that Katrina actually did not know whether she had been with Morales would not have undercut this theory entirely, but a reasonable attorney would have understood that it could take out some of the sting.

As best as the Court can determine at this point, Callahan seems to have approached Katrina only as a potential alibi witness for the defense (he recalls only that he felt "deflated" after speaking to her about the alibi, *see* Oct. 27, 2005 Tr. 72), and not as a prosecution witness. But as the Court has indicated, she was both. It was clear from Katrina's statement to the police that she was in a position to render testimony that would be highly damaging to Morales.

Because Callahan interviewed Katrina by himself, he was the only person who could prove up her arguably inconsistent statement. Yet Callahan could not testify without first withdrawing as Morales' counsel, a step he does not appear to have considered. The reason Callahan would have had to withdraw is the ethical rule, well known to any reasonable attorney, that an attorney may not continue employment in litigation if he reasonably should know that he should be called as a witness on behalf of his client. *See* Ill. R. Prof. Conduct 3.7(a).

The Court does not mean to suggest that Callahan performed deficiently by failing to withdraw as counsel. But once Katrina told that she did not know whether Morales was with her the night of the shooting (not that he *was not* with her), it was incumbent upon him to take the steps necessary to be able to prove up the inconsistency if and when she testified as a prosecution witness at trial. This is not a

matter of 20/20 hindsight; it would have been clear to any reasonably competent attorney. The Court is in no position to know why Callahan did not take this step, nor does it matter. It is enough that the record does not reflect, and one cannot reasonably fathom, any legitimate strategic reason for not doing so.[12]

Morales does not suggest in his post-hearing memoranda that Callahan would have been able to discover, had he interviewed Katrina, the benefits she received from the prosecution in connection with her cooperation and testimony. That said, it is unlikely Callahan would have uncovered this via an interview. As best as the Court has been able to determine, any undertaking by the prosecution to relocate Katrina or pay her to relocate occurred near the time of trial. There would have been no reason for Callahan to re-interview her at that point if he had earlier secured the basis to show she had given inconsistent statements.

The Court defers for the moment discussion of the issue of prejudice. It makes more sense to address that point after dealing with Morales' claim that Callahan performed deficiently in failing to investigate Thomas Scimone or call him to testify.

### b. Thomas Scimone

In deciding Morales' appeal from the denial of his first post-conviction petition, the state appellate court hypothesized an "apparent strategic reason" for Callahan's failure to call Thomas Scimone to testify. Specifically, the court noted that Thomas had stated (in his affidavit submitted with Morales' post-conviction petition) that at the time of the shooting, he was purchasing cocaine from Morales and cooking it into crack.

---

[12] The evidence suggests that Callahan simply may not have had the experience or savvy, at that early stage of his career, to realize what he needed to do.

*Morales II*, slip op. at 10. The court said that "[t]his statement presents an apparent strategic reason for not calling Thomas Scimone to testify." *Id.* For that reason, the court concluded, Callahan "did not act unreasonably." *Id.*

The court did not conclude that this was Callahan's *actual* reason for failing to call Scimone. Indeed, there would have been no basis for the court to make such a finding. The state trial judge who considered Morales' post-conviction petition denied his request for an evidentiary hearing, at which he might have been able to ascertain whether Callahan actually had any sort of strategic reason for not calling Thomas – and if so, what it was.

Contrary to the appellate court's suggestion, however, Morales did not simply make a claim of failing to call a witness. Specifically, that is not the way (or at least not the only way) that Morales argued the case in the state court. Rather, he also made a claim of failure to investigate. As Morales's post-conviction lawyer argued the case to the state trial judge, the contention was that "Thomas Simone [sic], who is Katrina's father was never contacted at all. He spoke to Thomas Simone on the day of trial because Thomas Simone found the attorney. . . . [P]etitioner's attorney, Mr. Callahan, certainly could have found Thomas Simone throughout this trial." June 18, 1998 Tr. 5.; *see also id.* 8 ("there was another very good alibi witness that could have been supported easily. Never called him. Never bothered him."). Morales specifically requested an evidentiary hearing to have "the opportunity to cross examine this man [Callahan] to find out why he didn't do these things, to bring these witnesses in." *Id.* 8.

Morales made the same argument on appeal from the dismissal of his post-

conviction petition. Specifically, he did not simply argue that Callahan should have called Thomas Scimone to testify. Rather, he argued that Callahan had unreasonably failed to investigate – that he had never spoken to Thomas before the trial even though it would have been easy to find him. *See* Resp. Ex. J (post-conviction appeal brief) at 22-23.

In short, the state appellate court did not address the claim – or at least one of the claims – that Morales made. Rather, it unreasonably limited his claim to one involving simply a failure to call Thomas to testify at the trial. (The court appears to have acted on the assumption that Callahan spoke with Thomas but did not call him to testify.) Because the appellate court did not rule on Morales' failure to investigate claim regarding Thomas, this Court addresses that claim *de novo*. *See, e.g., Carlson*, 526 F.3d at 1024.

The Court has little hesitation in concluding that Callahan acted below an objective standard of reasonableness in failing to interview or investigate a witness whom his client said could provide him an alibi. It is certainly possible that a reasonable attorney representing Morales ultimately could have made a justifiable strategic decision not to present an alibi defense, but no reasonable attorney could make such a decision without at least talking to the potential alibi witness. *See Raygoza v. Hulick*, 474 F.3d 958, 965 (7th Cir. 2007); *Stanley v. Bartley*, 465 F.3d 810, 813 (7th Cir. 2006). As the Supreme Court stated in *Strickland*, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 690. Callahan's failure to interview Thomas

before trial cannot by any stretch of the imagination qualify as a "reasonable investigation."

When, as in this case, an attorney is claimed to have made a strategic choice not to pursue a particular defense, such a choice is deemed "reasonable *precisely to the extent that reasonable professional judgments support the limitations on investigation*." *Id.* at 690-91 (emphasis added). Though the state appellate court did not directly address Morales' claim of failure to investigate regarding Thomas Scimone, its rejection of Morales' related claim concerning Callahan's failure to call Thomas to testify purports to have been based on this aspect of *Strickland*. For that reason, this Court turns to that issue and considers the reasonableness of the state court's strategic choice determination.

The state appellate court hypothesized an "apparent strategic reason" for Callahan's inaction. It relied on a prior decision in which it had reversed the dismissal of a post-conviction petition on the ground that trial counsel in that case had "no apparent strategic reason" for not calling alibi witnesses to testify. *Morales II*, slip op. at 10 (citing *People v. Tate*, 305 Ill. App. 3d 607, 612, 712 N.E.2d 826, 830 (1999)). The court in *Morales II* then flipped the "no apparent strategic reason" test to apply its converse in Morales' case, saying the following:

> Here, Thomas Scimone stated that at the time of the shooting, he was purchasing cocaine from defendant and "cook[ing] it up." This statement presents an apparent strategic reason for not calling Thomas Scimone to testify. Defense counsel did not act unreasonably . . . .

*Morales II*, slip op. at 10.

This was an unreasonable application (or perhaps a contradiction) of *Strickland*,

or it was, at a minimum, an unreasonable determination of the facts in light of the evidence presented in connection with the post-conviction petition and appeal.  A state court's decision is contrary to the Supreme Court's established precedents if the state court "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or if the state court "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent."  *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).  A state court unreasonably applies Supreme Court precedent when it "identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of [a defendant's] case."  *Rompilla v. Beard*, 545 U.S. 374, 380 (2005) (internal quotation marks and citations omitted). "[T]he state court's decision must have been [not only] incorrect or erroneous [but] objectively unreasonable."  *Wiggins*, 539 U.S. at 520-21 (internal quotation marks and citation omitted).

Nothing in *Strickland* or its Supreme Court progeny suggests that a court may hypothesize an "apparent" strategic reason for a defense attorney's action or inaction, at least not without some basis in the record.  Rather, *Strickland* points in exactly the opposite direction.  The Supreme Court made it clear in that case that a strategic choice of the type that is largely immune from attack is one "made after thorough investigation of the law and facts relevant to plausible options."  *Strickland*, 466 U.S. at 690.  The Court also said that to make an unchallengeable strategic choice, an attorney must have made a reasonable investigation or a reasonable decision that investigation

is unnecessary. *Id.* at 691. *Strickland* requires a court assessing a claim of ineffective assistance to "directly assess[ ]" the attorney's decision not to investigate "for reasonableness in all the circumstances," not simply to voice the words "strategic choice." *Id.*

The state appellate court did the exact opposite of what *Strickland* directs when it hypothesized an "apparent strategic reason" for Callahan's failure to call Thomas and then relied on that hypothetical reason to bless his so-called strategic choice. This approach is contrary to *Strickland*. The Fourth Circuit addressed a similar question in *Griffin v. Warden, Maryland Corr. Adjustment Ctr.*, 970 F.2d 1355 (4th Cir. 1992). The petitioner in that case had been convicted of armed robbery. He argued, among other things, that his trial counsel was ineffective for failing to interview and call an alibi witness. The state trial judge concluded that because a security guard had picked the claimed alibi witness from a photo array as one of the robbers, it might have been sound trial strategy not to call him. The Fourth Circuit rejected this, saying that the state court's

> reasoning [was] thoroughly disingenuous. [Counsel] did not even talk to [the witness], let along make some strategic decision not to call him. *Strickland* and its progeny certainly teach indulgence of the on-the-spot decisions of defense attorneys. *On the other hand, courts should not conjure up tactical decisions an attorney could have made, but plainly did not. The illogic of this "approach" is pellucidly depicted by this case, where the attorney's incompetent performance deprived him of the opportunity to make a tactical decision about putting Staples on the stand. . . . Tolerance of tactical miscalculations is one thing; fabrication of tactical excuses is another.*

*Id.* at 1358-59 (emphasis added). Indeed, the Supreme Court has made it clear that hindsight cannot be used to supply a reasonable reason for an attorney's decision. *See*

*Kimmelman v. Morrison*, 477 U.S. 365, 386-87 (1986) (citing *Strickland*, 466 U.S. at 689).

There is another, equally significant problem with the state appellate court's hypothesized reason for Callahan's inaction. The court assumed that Callahan was aware that Thomas would say that he had engaged in a drug deal with Morales and was using drugs with him on the night of the shooting. But this assumption was based on thin air, not on anything in the record, and not on what *Strickland* requires: a "direct assess[ment]" of Callahan's purported decision and its basis. *Strickland*, 466 U.S. at 691.

The record before the appellate court provided no basis for the assumption that Callahan had any clue that Thomas would say he had engaged in a drug deal and drug use with Morales that night. To be sure, Thomas's affidavit, which was included with Morales' post-conviction petition, stated that he was with Morales the night of the shooting and that they engaged in a drug transaction and used drugs. *See* Resp. Ex. G at C43-45. But there was nothing in the record hinting that Callahan was aware of this, as the state court appears to have assumed. There was no basis for the court to infer or assume this from Thomas' affidavit; Thomas did not say or hint that he discussed the circumstances with Callahan in their brief purported telephone call (indeed, Thomas did not say so in his testimony at the hearing in the present case either). And there was no evidence from any other source suggesting this either. *See* Resp. Exs. F & G (original and amended post-conviction petitions).

In short, there was nothing in the state court record to support an inference that Callahan had the knowledge that would have given rise to the appellate court's

hypothesized "apparent strategic reason" for not calling Thomas to testify. The fact that Thomas said in an affidavit that he bought drugs from Morales and used drugs with him does not indicate, without more, that Callahan was aware of those facts.

There is another equally important point. In his affidavit submitted to the state court, Thomas said that he spoke with Callahan only on the first day of trial. There was no hint in the record of an earlier interview, whether in person or by telephone. Thus the very evidence on which the appellate court relied in affirming the dismissal of Morales' post-conviction petition reflected that Callahan had made no *pretrial* investigation at all of Thomas's support for an alibi. Given that circumstance, no reasonable application of *Strickland* could lead to a conclusion that Callahan had made a "reasonable investigation" regarding Thomas at all, let alone an investigation that justified a decision not to call him to testify.

To summarize, the record before the state appellate court suggested facts that conceivable might have supported a viable strategic decision by Callahan not to pursue an alibi defense based on Thomas's testimony. But the record provided no support for a finding that Callahan had any inkling of those facts. And the record affirmatively showed that Callahan had made no inquiry into this potential alibi witness before the trial started. Whether Callahan's inaction and his decision not to pursue Thomas via interview or as a witness was a result of inexperience, time pressure, or some other cause is beside the point. The evidence is abundantly clear that Callahan's inaction was not the result of a "reasonable decision." *Strickland*, 466 U.S. at 691. In fact, it is difficult to imagine an attorney making a "reasonable decision" about the viability of an alibi without speaking to the alibi witness. *See, e.g., Bryant v. Scott*, 28 F.3d 1411,

69

1419 (5th Cir. 1994) ("without speaking to Marsaw, Moore was ill equipped to assess his credibility or persuasiveness as a witness, despite the objective factors tending to impugn Marsaw's credibility); *Lord v. Wood*, 184 F.3d 1083, 1085 (9th Cir. 1999) ("counsel cannot make [credibility] judgments about a witness without looking him in the eye and hearing him tell his story.").

For these reasons, the Court concludes that the state court's determination that Callahan "did not act unreasonably" vis-a-vis Thomas was unreasonable, and not simply erroneous. The court applied an "apparent strategic reason" test that was contrary to, or an unreasonable application of *Strickland*. And even were that not the case, its finding of an "apparent strategic reason" was an unreasonable determination of the fats in light of the evidence presented.

### c. Prejudice

No court has yet assessed the combined prejudice resulting from Callahan's unreasonable performance vis-a-vis Katrina and Thomas Scimone. The Court now proceeds to that part of the *Strickland* test. Under *Strickland*, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. This does not require a showing that Morales was innocent; rather, the question is "whether if he had had a competent lawyer he would have had a reasonable chance (it needn't be a 50 percent or greater chance) of being acquitted." *Stanley*, 465 F.3d at 814.

The Court is unpersuaded that Morales would have had a reasonable chance of an acquittal even if Callahan had interviewed Katrina with a "prover" present and even if he had investigated the claimed alibi in a reasonably competent fashion prior to trial and called Thomas to testify.  As a practical matter, Morales stood little chance of success unless he was able to shed doubt on the eyewitness identifications and Katrina's testimony that he admitted being present at the shooting and importuned her to help him with an alibi.  Undercutting the identifications would have required more evidence than Morales already had to cast doubt on the circumstances under which they were made, or providing an alibi.  Katrina and Thomas's affidavits suggest no basis to question the circumstances of the eyewitness identifications directly.

That leaves the alibi.  If Callahan had made a reasonably competent investigation about Morales' claim to have been with Thomas, he would have learned that, like Morales, Thomas contended he had driven Morales in a 1983 white Jetta. The same reasonably competent investigation, however, would have turned up the vehicle registration evidence that has now been presented.  That evidence would have undermined Thomas's alibi testimony, for the reasons the Court has described.

In addition, even if Callahan had interviewed Katrina with a "prover," there is no basis to believe that her trial testimony as a prosecution witness would have differed on direct examination.  She would have testified that she was not with Morales and that he called her to try to get her to support an alibi and, in doing so, admitted he was present at the shooting.  The only part of this that Callahan would have been able to attack on cross-examination (beyond what he otherwise brought out at the trial) was the definitive statement that Katrina *was not* with Morales.  But because Katrina did not tell Callahan

that she *was* with Morales – and indeed does not say that even to this day – the value

of the impeachment would have been relatively insignificant in the overall scheme of

things. It would have left intact Katrina's testimony that Morales pushed her to support

an alibi that she was unable to support truthfully and, more importantly, her testimony

that he admitted being present at the shooting.

Given these circumstances, the Court concludes that Morales has failed to show

that he would have had a reasonable chance of an acquittal had Callahan performed in

a reasonably adequate fashion.[13]

### c.    Other ineffective assistance allegations in habeas corpus petition

As noted earlier, Morales contends in his second amended habeas corpus

petition that Callahan rendered ineffective assistance by failing to subpoena police

"street files," gunshot residue tests, medical and hospital records of Crawford and

Nevarro, and telephone records of Katrina and Morales. Respondent contends that

these contentions have been procedurally defaulted.

Morales asserted his claim regarding Callahan's failure to subpoena

documentary evidence in his original petition for post-conviction relief. Respondent

argues that he abandoned the claim by failing to include it in his amended petition, but

---

[13]    As suggested earlier, there is some slim chance that an adequate pretrial
investigation might have uncovered the fact that the state's attorney's office had given
relocation benefits to Katrina and paid for a hotel stay for her. But bringing that out
arguably would have been a two-edged sword for Morales. Had Callahan elicited this
information on cross-examination of Katrina, the prosecution might have been
permitted, on redirect, to bring out the reasons why – in other words, testimony that she
had received threats. (The trial judge struck testimony along these lines during the
actual trial when Simmons tried to elicit it from Katrina on redirect, but the ruling might
have been different had Callahan elicited on cross that Katrina had actually received or
been promised benefits.)

that argument overlooks the fact that in the amended petition, Morales said that he "*adds* the following" allegations – not that he was replacing the original petition with the amended one.  Resp. Ex. G at 1 (emphasis added).  The trial judge rejected the claim on the merits.

That said, Morales did default his contentions regarding street files, gunshot residue tests, and medical / hospital records by failing to assert those contentions in his appeal from the trial judge's denial of the post-conviction petition.  Because Illinois courts normally treat failure to appeal from the dismissal of a post-conviction petition "as a procedural default barring further review, that default likewise bars federal review" of these contentions absent some basis to excuse the default.  *See Cawley v. DeTella*, 71 F.3d 691, 694 (7th Cir. 1995).  The only excuse Morales has offered for the default is his actual innocence claim, which the Court has earlier rejected as falling short of what the law requires in that regard.

Morales did assert on appeal, however, Callahan's failure to subpoena Katrina's and Morales's telephone records.  *See* Resp. Ex. J at 19-20.  The Illinois Appellate Court did not address the point in affirming the trial court's decision.  In his *pro se* petition for leave to appeal to the Illinois Supreme Court, Morales appealed generally. The Court therefore concludes that Morales pursued this particular contention through an entire cycle of Illinois' trial and appellate process, meaning that the contention is not procedurally defaulted.

Because the state courts never addressed the claim on the merits, the deferential standard of review established in 28 U.S.C. § 2254(d) does not apply.  For this reason, the Court relies on the general standard of review contained in 28 U.S.C. §

2243, which requires a court to "dispose of the matter as law and justice require." *See, e.g., Canaan v. McBride*, 395 F.3d 376, 383 (7th Cir. 2005).

The Court applies the *Strickland* standard *de novo*. *Id.*; *see also, Hough v. Anderson*, 272 F.3d 878, 904 n.13 (7th Cir. 2001). The problem for Morales is that in his habeas corpus petition, he makes only the bare statement that Callahan failed to subpoena the telephone records. He has provided no basis for a finding that this prejudiced him. As the Court has noted, despite providing some helpful testimony to Morales at the hearing in this case, Katrina has never disavowed her statement that Morales called her to ask her to support his alibi claim.

### d.    Other ineffective assistance allegations in post-hearing brief

In his post-hearing brief, Morales argues not only that Callahan was ineffective in his conduct vis-a-vis the Scimones, but also for failing to interview the shooting victims; failing to call co-defendants Jacques and Gonzalez to testify at trial; failing to interview Gonzalez and Caldera, the other co-defendant; failing to call Desire Aponte; and failing to locate and interview Roberto Moncada. Pet.'s Mem. (Dkt. No. 155) at 32-33, 37, 39. The problem with these additional contentions is that Morales never made them in state court, and he offers no excuse for failing to do so. These claims have been procedurally defaulted, and as noted earlier, Morales has failed to establish the basis for the only excuse he offers for the default, his actual innocence argument.

Even if Morales had properly presented these claims, they would be lacking in merit. First, Callahan could not properly interview Gonzalez or Caldera without their lawyers' knowledge and consent. Morales offers no basis to believe that the lawyers

would have consented to an interview.  Indeed, it is difficult to imagine any reasonable criminal defense attorney doing so under the circumstances.

Second, there is no basis to believe that Gonzalez or Jacques would have testified in Morales' defense.  Moreover, any testimony by Jacques that Morales was not involved in the shooting would have been meaningless absent an admission that *she was* involved (otherwise how would she know Morales wasn't?).  No criminal defense attorney worthy of the term would have allowed Jacques to testify for Morales under those circumstances.

Third, even though Gonzalez *now* says that Morales was not involved, had Morales been able to require him to testify at trial – which is by no means clear – that testimony would have followed by only a couple of days Gonzalez's admission under oath, during his guilty plea, that Morales was the second shooter.  The jury would have heard that sworn admission.  On balance, there is no basis to believe that Gonzalez's testimony would have helped Morales.

Fourth, with regard to Desire Aponte, Morales does not provide any viable explanation of how Callahan could have figured out back in 1996 that Moncada was the second shooter or that there was anyone who would identify him as such.  Thus the contention that Callahan should have interviewed and called Aponte and Moncada gets Morales nowhere.

Finally, with regard to the shooting victims, Morales has offered no evidence that interviewing them would have turned up any favorable or impeaching evidence beyond what Callahan already obtained via cross-examination at trial.  The Court does not mean by this to excuse or condone the apparent absence of any attempt by Callahan to

contact these key witnesses himself or via an investigator. The point, rather, is that Morales has not shown what Callahan would have obtained from the victims in an interview. For this reason, he cannot establish prejudice from Callahan's failure to interview them.

## Conclusion

For the reasons stated above, the Court directs the Clerk to enter judgment in favor of respondent and against petitioner, and denying the petition for a writ of habeas corpus. The Court issues a certificate of appealability on Morales' claims of ineffective assistance relating to Katrina and Thomas Scimone and his claim involving the use of perjured testimony.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: February 25, 2010